**In re Lowana BRUEN, Debtor.**

**Lowana Bruen, Plaintiff,**

v.

**U.S.A., et al, Defendant.**

No. 00–3108.

United States Bankruptcy Court,
N.D. Ohio.

Dec. 18, 2001.

Gordon R. Barry, Toledo, OH, for debtor.

James L. Roger, Toledo, OH, for defendant.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff's Complaint to Determine the Dischargeability of certain Student Loan Debts held by the Defendant, Pennsylvania Higher Education Assistance Agency. At the Trial, the Parties were afforded the opportunity to present evidence and make any arguments that they wished the Court to consider in reaching its decision. This Court has now had the opportunity to review the written arguments of counsel, the evidence presented at Trial, as well as the entire record in the case. Based upon that review, and for the following reasons, the Court finds that the debts at issue herein are nondischargeable for purposes of bankruptcy law.

### FACTS

From 1989, until her graduation in 1993, the Debtor/Defendant Lowana S. Bruen (hereinafter referred to as the "Debtor") attended, as an education major, the University of Toledo. In order to finance her education, the Debtor took out various student loans totaling Forty-eight Thousand One Hundred Sixty-two and 48/100 dollars ($48,162.48). With respect to these debts, the uncontested facts in this case show two things: First, since the Debtor's student loans first became due in 1994, the Debtor has been granted three separate deferments on these obligations. In addition, the Debtor in 1997 applied for, but did not receive a fourth deferment on her student loan obligations. Second, the Debtor, since incurring her educational debts, has yet to make one voluntary payment thereon;[1] therefore, as the result of accruing interest, the Debtor, at the time of Trial, owed a total of Seventy-two Thousand Nine Hundred Seventy-three and 58/100 dollars ($72,973.58) on her student loan obligations.

On October 29, 1999, the Debtor contacted an attorney concerning the financial difficulties she was facing from her student loan obligations. Approximately four months thereafter, on March 1, 2000, the Debtor filed a voluntary petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. In her petition, the Debtor listed her student loan debts which constituted the majority of her unsecured debt. Thereafter, in accordance with Bankruptcy Rule 7001, the Debtor filed the instant complaint seeking to discharge the educational debts held by the Creditor/Defendant, Pennsylvania Higher Education Assistance Agency. In response, the Creditor/Defendant, Pennsylvania Higher Education Assistance Agency (hereinafter referred to as the "PHEAA"), asserted that the repayment of these debts would not impose upon the Debtor an undue hardship, and thus these

---

1. The IRS set off a tax refund owed the Debtor in the amount $223.65.

debts, being education loans, should be found to be nondischargeable pursuant to 11 U.S.C. § 523(a)(8). At the Trial held on this matter, the Debtor agreed that the circumstances of her case did not, within the meaning of § 523(a)(8), constitute an undue hardship. The Debtor, however, based upon the equities of her situation, asked the Court to exercise its equitable powers under 11 U.S.C. § 105(a) so as to provide her with some relief from her student loan obligations. With regards to this request, the following factual information was presented to the Court:

The Debtor is forty-five (45) years of age, and from all appearances in good health. The Debtor is married to George Bruen who is fifty-four (54) years of age, and who is employed as an electrician. The Debtor's husband is also the sole proprietor of a horse stable business in which he boards other people's horses.

In 1993, the Debtor graduated from the University of Toledo with a B.S. in Education. Shortly following this event, the Debtor secured employment, first as a substitute teacher and then later as full-time teacher, with the Toledo Public School System (hereinafter referred to as the "TPS"). Presently, the Debtor continues to work as a full-time teacher with TPS. From her employment with TPS, the Debtor has experienced gradual increases in her pay. Specifically, for the years 1997 through 2000, the Debtor's respective income was shown to be this: $25,173.00; $27,022.00; $29,015.00; and $30,951.00. As for her present income, the Debtor's expected gross annual income from TPS for the year 2001 is Thirty-one Thousand Five Hundred Eighty dollars ($31,580.00). In the future, the Debtor testified that she could expect annual pay increases from TPS in the amount of 3%.

In addition to her employment with TPS, the Debtor also works at a couple of additional jobs First, during the summer months, the Debtor testified that, since 1993, she has worked at Harbor Behavioral Healthcare. By working in this position, the evidence presented in this case revealed that the Debtor's annual salary is increased by approximately Three Thousand dollars ($3,000.00). The Debtor also testified that she performs odd jobs in her husband's horse boarding business. However, no compensation is received for this work, which according to the Debtor, is done solely out of her love of horses.

Based upon the Debtor's employment, the facts put forth in this case show that the Debtor's take-home pay is just over Two Thousand dollars ($2,000.00) per month. In terms of the Debtor's necessary expenses, conflicting and somewhat confusing evidence was presented in this case. For example, the Debtor presented evidence that, for a time, she incurred additional expenses (and also income) when she was appointed the legal guardian of her sister's minor children. In addition, the Court had a hard time differentiating the expenses the Debtor's husband incurs in his horse boarding business with those expenses rightfully attributable to the Debtor. The Court, however, after carefully reviewing the evidence, finds that the Debtor has these necessary monthly expenses:

| | |
|---|---|
| House Payment | $ 778.00 |
| Home Insurance | $ 41.00 |
| Real Estate Taxes | $ 57.00 |
| Electricity/Heating Fuel | $ 124.00 |
| Telephoné | $ 30.00 |
| Garbage | $ 7.00 |
| Home Maintenance | $ 90.00 |
| Food | $ 250.00 |

| | | |
|---|---|---|
| Clothing | $ | 45.00 |
| Laundry | $ | 5.00 |
| Medical/Dental | $ | 20.00 |
| Transportation | $ | 75.00 |
| Auto Insurance | $ | 57.00 |
| Union Dues | $ | 51.00 |
| Auto Maintenance | $ | 67.00 |
| Entertainment | $ | 50.00 |
| Total | | $1,747.00 |

Based upon her income and expenses, the Debtor, after being denied a fourth deferment, offered to pay approximately Three Hundred dollars ($300.00) per month on her student loan obligations. However, according to the Debtor, her ability to pay more money toward her student loan obligations was limited by the available financial resources she has at her disposable. In particular, the Debtor pointed to the above enumerated income and expense figures which show that she has a limited amount of money available to service a student loan debt which now totals Seventy-two Thousand Nine Hundred Seventy-three and 58/100 dollars ($72,973.58). PHEAA, however, while not necessarily contesting the Debtor's above income and expense figures, argues that the Debtor has (or at least had) additional financial resources available at her disposable to repay her student loan debts. The circumstances surrounding these additional financial resources center around the Debtor's husband and the horse boarding business he owns; these particular circumstances were presented to the Court as this:

In 1996, the Debtor's husband sold a home, which he had obtained from a previous marriage, for Seventy-two Thousand dollars ($72,000.00). The proceeds generated therefrom were then used by both the Debtor and her husband to purchase a 10–acre plot of land in the country from which the Debtor's husband could begin to operate a horse boarding business. The purchase price for this property—on which sat a ten-year old three bedroom ranch style house, a barn and a smaller building—was One Hundred Forty Thousand dollars ($140,000.00). At the time of the purchase, the Debtor related to the Court that the property was in rather poor condition for her and her husband's particular needs. As a result, the Debtor and her husband financed an additional Fifty Thousand dollars ($50,000.00) against the property in order to make improvements thereto; these improvements consisted of replacing a furnace, adding new carpeting, building an additional building, adding an extension to an existing barn, and installing a large fence.

Since beginning his horse boarding business in 1996, the Debtor's husband has been unable to realize a profit from the operation of the business. As a result, both the Debtor and her husband have, over the last few years, received a significant amount of money in the form of tax refunds. In this regard, offered into evidence were copies of the joint income tax returns filed by the Debtor and her husband which show that for the tax years 1997 through 2000, the Debtor and her husband became entitled to receive refunds in the respective amounts of $9,669.00, $5,353.00, $11,119.00, and $6,945.00.[2] According to the Debtor, the proceeds received from these tax returns were either put back into the horse boarding business or were used to "catch up on their bills."

From all appearances, the primary reason the horse boarding business run by the

---

**2.** These returns, for an unknown reason, were not filed until September 29, 2000.

Debtor's husband has been unprofitable is that considerable sums of money have been needed by the business for capital improvements such as · equipment purchases or improvements to the real estate. In this regard, the evidence presented in this case shows that the Debtor's husband has, since 1997, expended the following sums for business purposes:

$52,130.00 in 2000

$88,015.00 in 1999

$15,331.00 in 1998

$84,000.00 in 1997

In order to meet these expenditures, the Debtor and her husband have, on at least three separate occasions, refinanced their property, receiving a total of One Hundred Forty-five Thousand dollars ($145,000.00). With respect to this refinancing, it was brought to the Court's attention that the Debtor and her husband had most recently refinanced their property on December 19, 1999,—a date which is approximately two months after the Debtor had first sought legal advice for her financial difficulties— for Fifty-two Thousand dollars ($52,-000.00). The proceeds received in this transaction were mainly used by the Debtor and her husband to purchase an additional five acres of land.

In addition to the foregoing facts regarding the horse boarding business run by the Debtor's husband, it was brought to the Court's attention that the Debtor's husband earns, in his job as an electrician, in excess of Forty-five Thousand dollars ($45,000.00) per year. The Court also takes judicial notice, from the papers filed in the Debtor's bankruptcy case, that the Debtor reaffirmed on two debts, which were secured against the real property owned by the Debtor and her husband, totaling over a quarter of a million dollars.

## *LAW*

### Section 105. Power of Court

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

## *DISCUSSION*

Under 28 U.S.C. § 157(b)(2)(I), a determination as to the dischargeability of a particular debt is a core proceeding. Thus, this matter is a core proceeding.

In the instant case, the Debtor seeks relief from her student loan obligations. In asking for relief, however, the Debtor has conceded—and this Court agrees— that the circumstances of her case do not fall within the "undue hardship" exception to nondischargeability contained in 11 U.S.C. § 523(a)(8). Instead, in seeking relief from her student loan obligations, the Debtor has asked this Court to invoke its equitable powers as provided for in 11 U.S.C. § 105(a).

Section 105(a) of Title 11 permits a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. For purposes of educational debts, this Court has adopted the policy that the powers accorded by § 105(a) permit a bankruptcy court to provide a student loan debtor with a partial discharge of his or her student loan obligation(s). This position was subsequently adopted by the Sixth Circuit Court of Appeals in *Tennessee Student Assistance*

*Corp. v. Hornsby (In re Hornsby)*, where it was stated:

> Although the bankruptcy court should not have discharged the ... entire student loans, we believe it had the power to take action short of total discharge. We find this authority in 11 U.S.C. § 105(a), which permits the bankruptcy court to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title,' so long as such action is consistent with the Bankruptcy Act. In a student-loan discharge case where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden on the debtor, an all-or-nothing treatment thwarts the purpose of the Bankruptcy Act.

144 F.3d 433, 438–39 (6th Cir.1998) (internal citations omitted).

█ Nevertheless, not all debtors are entitled to have their student loans reduced or otherwise adjusted. Rather, this Court has held that a bankruptcy court's utilization of its powers under § 105(a) is discretionary, and must be carefully honed in light of the facts of the case, applicable precedent and appropriate policy. *Wilcox v. Educ. Credit Management (In re Wilcox)*, 265 B.R. 864, 871 (Bankr.N.D.Ohio 2001). As a consequence, merely establishing that a debtor will receive a benefit by a partial discharge of a student loan obligation is insufficient, by itself, to warrant applying § 105(a) because all debtors would in some way benefit by having their student loan debts partially discharged. Instead, this Court has consistently held that § 105(a) should only be invoked if it is found that the equities of the situation tip distinctly in favor of the debtor. *Id.* Of vital importance in this regard, is whether the debtor dealt in good faith with his or her student loan obligation(s).

█ In support of the position that she acted in good faith with respect to her student loan debts, the Debtor's argument centers around two different facets of her case. First, the Debtor argues that the Court should consider the fact that, after receiving deferments on her loan obligations, she agreed to make partial payments (of about $300.00) on her student loan obligations. Second, the Debtor maintains that given the overwhelming nature of her student loan obligations, it is simply impossible for her to repay the student loan obligations in full.

█ In addressing these arguments, the Court must begin by outright rejecting the latter position espoused by the Debtor for to accept such an argument would reward those debtors who simply spend themselves into a position that they cannot afford. The Debtor's former argument, however, initially seems to have some merit as attempts by a debtor to repay a student loan debt are indicative of a debtor's good faith. *See In re Wilcox*, 265 B.R. at 870. The difficulty, however, the Court has with this position is that since her student loans first became due in 1994, the Debtor has not actually made any voluntary payments on her student loan obligations. This fact is made even more problematic when one considers that, for at least the past five years, the Debtor has had a steady source of income. However, even setting such concerns aside, the Court is very troubled by a couple of additional aspects of the Debtor's bankruptcy case.

First, as indicated before, approximately two months before the Debtor filed for bankruptcy relief, and also just two months after the Debtor had first contacted an attorney about bankruptcy, the Debtor, along with her husband, borrowed approximately Fifty Thousand dollars ($50,000.00) against their real property in

order to purchase an additional five acres of land. In this Court's judgment, the timing of these events are anything but coincidental, and lead to the conclusion that the Debtor, after being fully informed of her actions, intentionally sought to eliminate her equity in her real property. Such an action, of course, then enabled the Debtor, after reaffirming on the debts secured against her real property, to keep possession of her property free from the claims of the Trustee, and thus, by direct implication, free from the claims of the Debtor's unsecured creditors (of which PHEAA is the largest). Although such a course of conduct may be technically legal, such conduct does not lend itself to a finding that the Debtor acted in good faith.

The second major difficulty the Court has with the facts surrounding the Debtor's student loan obligations concerns the disposition of the Debtor's tax refunds. In particular, the facts presented in this case show that over a period of four years the Debtor, along with her husband, became entitled to receive over Thirty-three Thousand dollars ($33,000.00) in the form of tax refunds. None of this money, however, was utilized by the Debtor to pay her student loan obligations; instead, the tax refund money was used, according to the Debtor's own testimony, to pay bills and to help finance the large expenditures incurred in the horse boarding business operated by the Debtor's husband. In this respect, what this Court finds most troubling about these facts is that the Debtor did not consider her student loan obligations a "bill" worth paying. This naturally leads to a strong inference that the Debtor never intended to repay her student loan obligations. In addition, the Court also finds it disturbing that the Debtor, after receiving the benefits of her educational loans, saw fit to utilize her tax refunds to help support a business that has not turned a profit since its inception. On

this issue, it would seem highly inequitable to permit the Debtor and her husband, who together earn over Seventy-five Thousand dollars ($75,000.00) per year and who also own a property worth over a quarter of a million dollars, the luxury of operating a business on the back of PHEAA who, without regards to creditworthiness, financed the Debtor's higher education. In making this observation, the Court is reminded that § 523(a)(8) was designed to protect student loan creditors because "unlike commercial transactions where credit is extended based on the debtor's collateral, income, and credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation." *Andrews University v. Merchant, (In re Merchant)*, 958 F.2d 738, 740 (6th Cir.1992).

▮ Thus, to the Court, the above circumstances are clearly contrary to a debtor who acted in good faith. However, even if for argumentative sake the above circumstances were not at issue, it is apparent that many of the traditional indicia of good faith in the context of a student loan obligation are not present in this case. These traditional indicia include, but are not necessarily limited to: (1) whether a debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control; (2) whether the debtor has realistically used all their available financial resources to pay the debt; (3) whether, as stated above, the debtor has, in fact, attempted to repay the student loan debt; (4) whether the debtor is using their best efforts to maximize their financial potential; (5) the length of time after the student loan first becomes due that the debtor seeks to discharge the debt; (6) the percentage of the student loan debt in relation to the debtor's total indebtedness; and (7) whether the debtor

obtained any tangible benefit(s) from their student loan obligation. *In re Wilcox*, 265 B.R. at 870; *Miller v. U.S. Dep't of Educ. (In re Miller)*, 254 B.R. 200, 206 (Bankr. N.D.Ohio 2000). Therefore, when all things are considered, it is apparent that the circumstances of the Debtor's bankruptcy case are simply inconsistent with the concept of good faith. As such, the Court will not invoke its equitable powers under § 105(a) so as to provide the Debtor with a partial discharge of her student loan obligations. In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the student loan obligations of the Plaintiff, Lowana Bruen, to the Defendant, Pennsylvania Higher Education Assistance Agency, be, and are hereby, determined to be NONDISCHARGEABLE DEBTS pursuant to 11 U.S.C. § 523(a)(8).