The **NORTH RIVER INSURANCE COM-PANY** and Irvin Lee Bailey, Plaintiffs,

v.

The **CONNECTICUT FIRE INSURANCE COMPANY**, Helen B. Terry, Administratrix of the Estate of Chiswell Dabney Terry, deceased, and Isaac Jones Terry, Defendants.

**Civ. A. No. 577.**

United States District Court
W. D. Virginia.
June 19, 1964.

Richard C. Rakes, of Gentry Locke & Rakes, Roanoke, Va., for plaintiffs North River Ins. Co. and Bailey.

Charles R. Warren, Jr., Danville, Va., for defendant Connecticut Fire Ins. Co.

C. Stuart Wheatley, of Talbott, Wheatley & Talbott, Danville, Va., for defendant Helen B. Terry.

William H. Smith, of Garrett, Garrett & Smith, Danville, Va., for defendant Isaac Jones Terry.

Edwin B. Meade, of Meade, Tate & Meade, Danville, Va., for defendant Fidelity & Casualty Co.

DALTON, Chief Judge.

This is a declaratory judgment action to determine the potential insurance coverage available for liability incurred by Irvin L. Bailey, one of the plaintiffs herein, as a result of losses sustained in an accident which occurred while he was driving a "non-owned" automobile. The action was heard by the Court without a jury.

In the one-car collision Isaac Terry, defendant, allegedly suffered personal injuries and Chiswell D. Terry was killed. The latter's personal representative, Mrs. Helen Terry, is also named as defendant herein. The material facts leading to the controversy involve a series of transactions relating to the wrecked vehicle, a 1957 Ford sedan, which had been repossessed by the Southern Bank of Commerce in Danville, Virginia (hereinafter called "Southern Bank"). The repossession took place on September 12, 1962, after default by a conditional vendee. Thereafter, the car was offered for sale by the bank at public auction on October 11, 1962. At the public sale, there being no reasonable bid by an outsider, the bank "bought in" the automobile. The car was then placed in a garage for reconditioning and thence in a warehouse maintained by the bank where approximately fifteen other repossessed automobiles were located. Periodic advertisements were placed in the news media by the bank, offering these vehicles for sale and inviting prospective purchasers to inspect such vehicles in the warehouse. Later, when the car in question did not sell via this outlet, the bank placed the car for sale on the used car lot of Clinton C. Bivens, trading as Bivens Motor Sales in Danville, Virginia.

Sometime during the interval between the public sale and the placing of the car on Bivens' lot, Southern Bank applied for and was issued a certificate of title by the Division of Motor Vehicles of Virginia, naming Southern Bank as the

registered owner of the car. The exact date on which this transaction occurred is not of evidence. Likewise, the records produced by the bank at the trial did not indicate the date on which the car was removed from the bank's warehouse and placed on the Bivens lot. It appears from the preliminary stipulation of facts,[1] however, that the car was delivered to Bivens Motor Sales on November 26, 1962, with the understanding that Bivens would attempt to sell the car and, if successful, he was to deliver the sum of $500.00 to the bank, retaining any excess proceeds over that amount as a sales commission.

Pursuant to this agreement, sometime during the early part of the day on Sunday, December 9, 1962, Isaac Terry, a salesman employed by Bivens, accompanied by his brother, Chiswell D. Terry, took the Ford automobile from Danville, Virginia, to the home of Irvin Bailey to interest him in purchasing it. Shortly thereafter, the three men left the Bailey home near Pelham, North Carolina. As to the ensuing course of events there is considerable conflict in the evidence. For present purposes, it is enough to say that several hours elapsed while the three men were together, during which a part of the time was spent in negotiations concerning the sale of the Ford. Shortly after 4:00 P.M., while Bailey was driving the car in Caswell County, North Carolina, a short distance south of Danville, Virginia, the car left the roadway on the right side, striking several objects, killing Chiswell Terry and injuring Isaac Terry. The driver, Bailey, was not injured. He testified that, had the accident not occurred, he would quite likely have bought the car if he and Isaac Terry could have been able to come to satisfactory terms for a trade between an older car owned by Bailey and the Ford in question.

The North River Insurance Company, plaintiff herein, insured Clinton C. Bivens, doing business as Bivens Motor Sales, under a garage liability policy with coverage as follows: bodily injury liability, $15,000 each person and $30,000 each accident; property damage liability, $5,000 each accident.

The Southern Bank of Commerce was insured by The Connecticut Fire Insurance Company under an Employers' Non-ownership Liability Policy with additional endorsements for hired automobiles and repossessed automobiles. The coverage under this policy provided for: bodily injury liability, $100,000 each person and $300,000 each accident; property damage, $50,000 each accident.

The Fidelity and Casualty Company of New York, third-party defendant, insured Irvin Bailey under a family automobile liability policy covering two cars which he owned, neither of which was involved in the accident in question. The coverage under this policy was as follows: bodily injury liability, $15,000 each person and $30,000 each accident; property damage $5,000 each accident.

The primary issue to be determined by the Court, then, is the nature and extent of the potential coverage available to Irvin Bailey under each of the three insurance policies described above, as a result of liability incurred by him arising out of the factual circumstances developed in the evidence as set forth above and hereinafter.

The North River Insurance Company (sometimes hereinafter called "North River") concedes that its garage liability policy issued to Clinton Bivens affords primary coverage under the omnibus clause, for any legal claims against Irvin Bailey arising out of the accident, excepting any claim for alleged personal injuries suffered by Isaac Terry. The claims of Isaac Terry are allegedly excluded from coverage under the North River policy in that he was an employee of North River's named insured, Clinton

---

1. The preliminary stipulation of facts, while not agreed to by all the parties prior to trial, was accepted after all the evidence was in as accurately representing the facts of the case except in the few instances where express reservations were made.

Bivens. This exclusion in the North River policy is discussed hereafter in the opinion. Aside from any such claim by Isaac Terry, the principal contention made on behalf of the North River Company is that the policy issued to Southern Bank by The Connecticut Fire Insurance Company (sometimes hereinafter called "Connecticut") also affords primary coverage for any claims against Bailey and therefore that Connecticut must provide pro rata coverage along with North River.

## I  *The Connecticut Fire Insurance Company*

■ First, the Court will consider the liability of The Connecticut Fire Insurance Company on the Combination Automobile Policy held in force by the Southern Bank of Commerce in Danville, Virginia. This policy provides coverage for:

1. Employer's non-ownership liability,

2. repossessed automobiles, and

3. hired automobiles.

Under the repossessed automobiles endorsement attached to the principal coverage of the policy, the insurance would apply to any person driving a repossessed automobile with the permission of the named insured (1) while the automobile was being repossessed by the named insured, or, (2) during maintenance or use of the automobile in connection with resale following the repossession. The automobile was placed on the Bivens lot in connection with resale and, of course, Bivens had permission to drive the car himself, and authority to allow other persons, such as Bailey, to drive the car with the implied permission of the bank for the purpose of effectuating a sale thereof. Under Virginia law the bank need not know the identity of the driver in order to imply its permission. American Automobile Ins. Co. v. Fulcher, 201 F.2d 751 (4th Cir. 1953).

As stated, there is conflicting evidence with regard to the course of conduct followed by Bailey and the Terrys prior to the accident on December 9, 1962. According to Bailey's testimony, Chiswell and Isaac Terry picked him up at his home sometime before noon on that day. He drove the automobile and they discussed the terms of a trade between an older automobile owned by Bailey and the Ford automobile in question. Bailey then related a course of events which, if not refuted, would bring into issue the question of whether or not the parties had remained within the scope of permissive operators of the automobile. The accident occurred shortly after four o'clock in the afternoon, over four hours after they left Bailey's home to demonstrate the automobile, according to Bailey. Isaac Terry testified, however, that they had not picked up Bailey prior to 12:00 o'clock, that it had been sometime later in the afternoon. He said that the parties had continued to discuss the purchase of the automobile intermittently throughout the time they were together. Bailey's testimony was in agreement on this point and he said that it is quite likely that he would have purchased the automobile had it not been for the wreck. It is also noted that Bivens, the dealer to whom the car was entrusted by the bank, testified that Terry would have authority to stay with a customer all day if he chose to do so.

■■ Viewing the authorities, it becomes apparent that many courts are reluctant to find a deviation from the scope of permission once the vehicle has been entrusted to an operator by the named insured or by one having authority to give permission. Peerless Insurance Co. v. Schnauder, 290 F.2d 607 (5th Cir. 1961); O'Roak v. Lloyds Cas. Co., 285 Mass. 532, 189 N.E. 571 (1934); Matits v. Nationwide Mut. Ins. Co., 33 N.J. 488, 166 A.2d 345 (1960); Stovall v. New York Indem. Co., 157 Tenn. 301, 8 S.W.2d 473, 72 A. L.R. 1368 (1928). The general rule is that the insurer remains liable under the so called "omnibus clause" where there is no more than a "slight deviation" from the permission granted by the named insured. See, 7 Appleman, Insurance Law & Practice § 4366 (1962). It would seem that this is especially true in cases such as the present one where no specific limi-

tations were placed on the permissive use of the automobile. For these reasons it is concluded by the Court that there was no more than a slight deviation, if any, from the scope of the intended use of the vehicle by the prospective purchaser and that he, at all times, remained a permissive user of the automobile.

■ The primary contention made on behalf of Connecticut is that its policy does not provide coverage for liability arising out of the accident in question since the automobile involved was owned by Southern Bank at the time of the accident. Connecticut's argument is that when Southern Bank bought the car in at the public auction, it thereafter dealt with the car, not as a repossessor, but as an absolute owner; therefore, it argues that the coverage provided under the non-owners policy would no longer apply.

The applicable coverage, if any, is extended under the repossessed automobiles liability endorsement which provides:

"It is agreed that *such insurance as is afforded by the policy* for Bodily Injury Liability and for Property Damage Liability *applies with respect to any automobile while being repossessed* by the named insured, or the maintenance or use thereof in connection with resale following such repossession, subject to the following provisions:

"1. Application of Insurance. This endorsement does not apply to any automobile while being used for personal, pleasure, family or other business purposes."
(Emphasis added.)

The question with which the Court is presented is whether or not the language in the endorsement limiting the coverage extended thereunder to "such insurance as is afforded by the policy" is to be construed as not providing insurance upon repossessed automobiles unless such automobile meets the "non-owned" qualification appearing in the principal coverage of the policy. Connecticut's view is that no premiums were charged for, and no coverage was provided for any vehicle owned by the named insured. The vice in the argument made on behalf of Connecticut is its failure to consider the two coverages separately: That is, (1) the coverage extended to the employer for non-ownership liability, arising primarily where an employee of the bank injures a third party while driving his personal car and engaged in the course of the bank's business, and (2) the coverage extended for liability arising in the course of dealing with repossessed cars. To construe the policy so as to make the non-ownership limitation in the first coverage applicable to the repossessed automobile coverage, this Court feels, would be unreasonably restrictive. This is especially true in light of the fact that in most instances where there is a repossession of an automobile in Virginia, the repossessor becomes the owner of the vehicle by operation of law. Va.Code Ann. § 46.1-93 (1950). See, United States Fidelity & Guaranty Co. v. Trussell, 208 F.Supp. 154 (W.D.Va.1962). The cited Code section provides:

"*Transfer by operation of law.—* * * * in the event of the transfer by operation of law of the title or interest of an owner in and to a motor vehicle * * * registered under the provisions of this chapter, to anyone * * * by * * * repossession upon default in the performing of the terms of a lease or executory sales contract or otherwise than by the voluntary act of the person whose title or interest is so transferred, the transferee or his legal representative shall make application to the Division for a certificate of title therefor, giving the name and address of the person entitled thereto, and accompany such application with the registration card and certificate of title previously issued for the motor vehicle, * * * if available, together with such instruments or documents of authority * * * as are required by law to evidence or effect a transfer of title or interest in or to chattels in such case. The Division when satis-

fied of the genuineness and regularity of the transfer shall cancel the registration of the motor vehicle * * * and issue a new certificate of title to the person entitled thereto." Va. Code Ann. § 46.1–93 (1950).

In the Trussell case, supra, on facts similar to the instant case, this section was held applicable to vest title to a repossessed automobile in the repossessing finance company. There, the court reasoned that the insurer of the finance company would be liable under a repossessed automobiles endorsement whether or not the car was owned by the finance company in that the endorsement provided coverage to *"any* automobile while being repossessed * * *", etc. (Emphasis added). Connecticut admits that under the Trussell case the endorsement would provide coverage on an owned automobile if the ownership were derived by operation of law, but seeks to distinguish this case based on the fact that Southern Bank bought the car in at public auction, and then applied for and had issued a certificate of title naming the bank as registered owner of the car. In the Trussell case no public sale had been undertaken. The finance company merely repossessed the vehicle and placed it on a used car lot for sale. It is also noted, in that case, the repossessed automobiles endorsement was not attached to a "non-owners" policy. Noting these differences, however, the Court is of the opinion that the result here should not differ from that reached in the Trussell case. The endorsement in question provides coverage, " * * * to *any* automobile while being repossessed by the named insured, or the maintenance or use thereof in connection with resale following such repossession." (Emphasis added.) Although, as noted above, there was some conflict in the evidence as to the nature of the mission Bailey and the Terry brothers were engaged in at the time of the accident, the Court holds that there was no material deviation from the business of demonstrating the automobile. Thus, the use of the automobile at the time of the accident was "in connection with resale following such repossession" as required by the endorsement. There being no evidence which would tend to indicate a use of the automobile by the bank for business or other purposes inconsistent with the requirements of the endorsement at any time subsequent to the repossession, it would seem, clearly, that the facts of this case come squarely within the coverage intended to be provided under the repossessed automobiles endorsement. Nowhere, in the language of the endorsement is ownership, or the lack thereof, made a qualification for its coverage. In fact, the endorsement unambiguously lays down the test for determining whether or not the coverage applies to a particular repossessed automobile in the limiting provision which states:

"1. Application of insurance. This endorsement does not apply to any automobile while being used for personal, pleasure, family or other business purpose."

Thus, the issue turns on the *use* in which the repossessed automobile is placed rather than on the question of ownership. If the bank had used the automobile in the ordinary course of its business, then the insurance provided by the endorsement would not apply. But the evidence indicates that the course of action followed by the bank included no other use of the vehicle except in connection with its resale. The bank should not be penalized in attempting to dispose of the vehicle by public sale, since this would serve to protect the right of the bank to pursue a deficiency judgment against the original defaulting vendee. Va.Code Ann. § 55–93 (1950). Thereafter, when Southern Bank applied for and received a certificate of title, such action was merely in compliance with the terms of § 46.-1–93, as quoted above, which provides:

" * * * in the event of a transfer by operation of law * * * the transferee * * * *shall make* application to the Division for a certifi-

cate of title * * *." Va.Code Ann. § 46.1–93 (1950). (Emphasis added.)

Thus, since the legal ownership of the automobile would have no bearing on the coverage provided under the repossessed automobiles endorsement, it is concluded that said endorsement is applicable under the facts of this case.

■ Connecticut further contends that its policy is not applicable in that the insurance provided by the policy to persons other than the named insured, under Insuring Agreement III, does not apply "to any persons or organization, or to any agent or employer thereof, operating an automobile sales agency, repair shop, service station, storage garage, or public parking place, with respect to any accident arising out of the operation thereof." It is argued on behalf of Connecticut that this limitation of coverage would operate to remove coverage from Bailey since Bailey was allowed to drive the vehicle as part of the work of Bivens Motor Sales. While, clearly, the automobile was being used in connection with a sales agency, a careful reading of the quoted insuring agreement discloses that the limitation does not apply to every accident arising out of the operation of such an automobile sales agency. The limitation would only apply where the person for whom insured status is sought, other than the named insured, is himself operating an automobile sales agency, or is the agent or employee of such an operation. See Tolsma v. Miller, 243 Wis. 19, 9 N.W.2d 111 (1943). Compare, Bendykowski v. Hall Chevrolet Co., 10 Wis.2d 579, 103 N.W.2d 516 (1960). Since Bailey was not engaged in such an operation and since his status as a prospective purchaser would not render him the agent or employee of Bivens Motor Sales, it must be concluded that the limitation of coverage contained in Insuring Agreement III would not be applicable in this instance.

It is, therefore, held and declared that The Connecticut Fire Insurance Company is responsible for any liability incurred by Bailey arising out of the accident in question subject only to the "Other Insurance" provision in the policy. This provision provides:

"*Other Insurance*— * * * If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss * * *."

Under this provision the Connecticut Company is allowed to prorate the liability it incurs under the policy with all other primary insurers according to the applicable limits of liability of all such insurers.

## II   The North River Insurance Company

■ As stated above, North River concedes that Irvin Bailey qualifies as an insured under its garage liability policy issued to Clinton Bivens, d/b/a Bivens Motor Sales and that, with but one exception, its policy provides coverage for claims against Bailey. Although Bivens at no time was the owner of the automobile in question, this fact would not be determinative of coverage. The North River policy provides automobile liability coverage as follows:

"*Automobile Hazards.*

"1.  *All Automobiles*

"(a) The ownership, maintenance or *use of any automobile for the purpose of garage operations,* and the occasional use for other business purposes * * * of any automobile owned by or in charge of the named insured and used principally in garage operations * * *."
(Emphasis added.)

The following are included as insureds under the policy:

"(3) With respect to the Automobile hazard:

"(a) any person while using, with the permission of

the named insured, an automobile to which the insurance applies under paragraph 1(a) * * * of the Automobile Hazards * * *."

Ownership of the automobile by Bivens is not a prerequisite to coverage so long as the use of the automobile is, "for the purpose of garage operations", and "with the permission of the named insured." There can be no question but that Bailey was driving the automobile with the permission of Clinton Bivens and that their purpose in driving the automobile was within the scope of "garage operations" since Bailey was accompanied by Isaac Terry, a salesman for Bivens, and was driving the car with a view toward purchasing it from Southern Bank, through Bivens Motor Sales; and since it has been previously decided that the parties had not departed from the business of demonstrating the automobile at the time of the accident. In fact, Bivens testified at the trial that he had confidence in Isaac Terry and that, although it would be unusual, Terry had authority to stay with a customer all day if he wanted to do so.

Insofar as the coverage provided by North River is concerned, the Court is left to determine only the coverage provided against the potential bodily injury claims of Isaac Terry, the salesman of Bivens Motor Sales. With regard to the alleged exclusion of coverage for such claim by Isaac Terry, the North River policy provides as follows:

"*Exclusions.* This policy does not apply under Part 1:

\* \* \* \* \* \*

"(b) to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured. * * *"

The question raised is whether or not the term "insured" in the exclusion refers to any insured under the policy including the named insured, Clinton Bivens, the employer of Isaac Terry; or does the term refer only to the particular insured presently seeking protection under the policy, (i. e. the additional insured, Irvin Bailey). If the term "insured" is given the latter construction, then the personal injury claim of Isaac Terry against Bailey would not be excluded from coverage under the North River policy because Isaac Terry was not an employee of Irvin Bailey, the "insured" presently seeking protection under the policy.

This issue, though not settled in the law of Virginia, has often been before other courts with greatly divergent results. See, Annot., 50 A.L.R.2d 78, 97 (1956). Clearly, the language of the exclusion would be applicable to deny coverage in a case where the named insured negligently inflicted injuries upon his own employee. The same would result where an additional insured injured his own employee. For in each of these instances the injured party is not in the class of the general public sought to be protected by the policy. But where an insured under the omnibus clause injures an employee of the named insured, there is no relationship between the two parties and there seems to be no reason why, as to the additional insured, the injured employee is not a member of the general public entitled to the benefits of the omnibus coverage. This seems especially true in light of the fact that the coverage extended to the named insured under the policy and the coverage extended under the omnibus clause are to be considered as completely separate and distinct. Greaves v. Public Service Mut. Ins. Co., 5 N.Y.2d 120, 181 N.Y.S.2d 489, 155 N.E. 2d 390 (1959).

In the law of Virginia the only controlling principle to be found is the general rule that in construing insurance contracts, in cases of ambiguity, the courts will lean to the construction most favorable to the insured. Ayers v. Harleysville Mut. Cas. Co., 172 Va. 383, 2 S.E.2d 303 (1939); Combs v. Hunt, 140 Va. 627, 125 S.E. 661, 37 A.L.R. 621 (1924); Phoenix Ins. Co. v. Shulman Co., 125 Va. 281, 99 S.E. 602 (1919). Can it be said that it is clear and unambiguous that an employee of "the insured", as used in the policy, was intended to mean

an employee of "any insured"? If this was intended, why was the policy not so worded, thus, clearly expressing an intent to exclude the liability to the employee of any insured regardless of which insured was presently seeking protection under the policy? On the other hand, can it be said that an employee of "the insured" refers only to an employee of the insured seeking coverage for liability arising from a particular accident? If so, why was the clause not drawn to exclude coverage for injuries to employees of "the insured claiming coverage", of other similar language expressing such intent?

It seems clear, from the above, that the only certainty is, that ambiguity does exist with regard to the use of the term "the insured" in the exclusion clause. Therefore, with the meaning of the exclusionary clause being ambiguous, and with the divergent results in the many cases construing the clause, this Court is of the opinion that the rule should be applied construing the policy against the insurer who wrote and issued the policy. This result finds additional support in the severability clause of the policy which provides that the liability coverage afforded by the policy "applies separately to each insured against whom claim is made or suit is brought." See, Kaifer v. Georgia Cas. Co., 67 F.2d 309 (9th Cir. 1933); Bethlehem Steel Co. v. Continental Cas. Co., 208 F.Supp. 356 (E.D.Pa.1959); Greaves v. Public Service Mut. Ins. Co., 5 N.Y.2d 120, 181 N.Y.S.2d 489, 155 N.E. 2d 390 (1959). It is held, therefore, that the phrase "the insured" in exclusion (f) of the North River policy refers only to Irvin Bailey, the insured presently seeking protection under the coverage of the policy. And since Isaac Terry was not an employee of Irvin Bailey, the exclusion does not apply. Therefore, subject only to the "Other Insurance" clause requiring the prorating of liability, the Court finds and declares that the North River policy affords primary protection for all the legal claims against Irvin Bailey arising out of the alleged accident of December 9. 1962.

### III *The Fidelity and Casualty Company of New York*

The Court has granted a motion to add The Fidelity and Casualty Company of New York as a third-party defendant in this cause. The Fidelity and Casualty Company of New York (hereinafter referred to as "Fidelity") insured Irvin Bailey under a Family Automobile Policy issued on a 1956 Ford automobile and a 1953 Ford automobile. In addition, the policy provides coverage as follows:

*"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay \* \* \* arising out of the \* \* \* use of \* \* \* any non-owned automobile. \* \* \*"* (Emphasis added.)

A "non-owned automobile" is defined as:

"an automobile \* \* \* not owned by or furnished for the regular use of either the named insured or any relative, other than a temporary substitute automobile."

It is clear and, in fact, all the parties concede that under the terms of the Fidelity policy, coverage is extended to the named insured, Irvin Bailey, while driving the automobile in question. However, since the automobile was a "non-owned automobile", the insurance provided by the policy is excess insurance:

" \* \* \* [T]he insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance."

The validity of this "excess insurance" provision has been recognized in the courts of various states. There can be no question concerning the validity of the "excess insurance" provision. Farm Bureau Mut. Auto. Ins. Co. v. Preferred Acc. Ins. Co., 78 F.Supp. 561 (W.D.Va. 1948); American Motorists Ins. Co. v. Weir, 132 Conn. 557, 46 A.2d 7 (1946); Allstate Ins. Co. v. Urban, 15 Ill.App.2d 386, 146 N.E.2d 387 (1957). The Court, therefore, holds and declares that the policy issued by Fidelity does provide coverage for the claims arising against Irvin Bailey as excess insurance, apply-

ing to the accident in question only after the applicable policy limits of the policies issued by Connecticut and North River have been exhausted.

### Uninsured Motorist Coverage

■ The pleadings also raised the issue of the applicable coverage available for any potential uninsured motorist claims arising on the theory that the Ford automobile was unlawfully forced to leave the roadway by an unidentified motorist. There was impeaching evidence to the effect that Isaac Terry had testified in a criminal proceeding against Bailey in North Carolina that another automobile had forced them off the highway. Isaac Terry testified at the trial of this case that he had made the statement in the North Carolina proceeding merely "to help Bailey out." He also testified that there was no other automobile involved in the alleged accident on December 9, 1962, and that they were not forced off the highway by any other vehicle. Terry stated that Bailey had been driving too fast and that he had warned Bailey to slow down before they rounded the curve on Holland Road where the accident occurred. Bailey testified to the effect that to his knowledge, no other automobile forced them off the roadway; although, his earlier testimony had been to the effect that he had "blacked out" immediately prior to the accident. Helen Terry, who came on the scene of the accident shortly after its occurrence, testified that she had not witnessed the accident but she was not aware that any other vehicle was involved. The decision of the Court, then, is that the operation of no other automobile was in any way involved in causing the alleged accident on December 9, 1962, and, therefore, the Court need not determine the potential uninsured motorist coverage available under the circumstances of this case.

### Summary

It is the conclusion of the Court that the policies issued by the North River Insurance Company and The Connecticut Fire Insurance Company provide pro rata primary coverage for any legal claims arising from the alleged accident on December 9, 1962, in which Irvin Bailey was involved, and that these two companies shall prorate the payment of any judgment which might be obtained against Irvin Bailey, arising out of such accident, according to the "Other Insurance" clauses in the respective policies and the applicable policy limits as heretofore set out in this opinion. It is further concluded that the policy issued by The Fidelity and Casualty Company of New York also provides coverage for any such claims against Irvin Bailey but that such coverage is only applicable as "excess insurance". Fidelity could, therefore, be called upon to pay any such judgments against Irvin Bailey only after the applicable policy limits of both the North River and the Connecticut policies have been exhausted.

An order will be entered accordingly.