In re Marlene MOFFETT, Debtor.

Tidewater Finance Company, Plaintiff,

v.

Marlene Moffett, Defendant.

No. 02–82020–SSM.

United States Bankruptcy Court,
E.D. Virginia.

July 8, 2002.

James R. Sheeran, Tidewater Finance Company, Virginia Beach, VA, for Tidewater Finance Company.

Klinette H. Kindred, Law Office of Robert Weed, Alexandria, VA, for the Debtor.

Gerald M. O'Donnell, Alexandria, VA, Chapter 13 Trustee.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

The issue before the court is whether a secured creditor's repossession of an automobile prior to the filing of a bankruptcy petition extinguishes the debtor's interest in the vehicle. The question arises in the context of a motion for relief from the automatic stay filed by Tidewater Finance Company ("Tidewater"), which repossessed the debtor's automobile for payment defaults early on the same day she filed her chapter 13 petition, and which now seeks leave to sell it.

Hearings were held in open court on May 20 and June 19, 2002. The debtor was present in person and was represented by her attorney of record. The movant was present by counsel. At the initial hearing, the court ruled that the repossession had not terminated the debtor's interest in the vehicle so as to preclude either an order for turnover or the treatment of Tidewater's secured claim in a chapter 13 plan. The court also ruled, however, that the debtor's unconfirmed plan did not provide for adequate protection of Tidewater's security interest. The court then continued the matter for a final hearing to permit the debtor to file a modified plan. She has now filed a modified plan which provides for full payment of Tidewater's claim with interest. By order entered June 20, 2002, the court denied relief from the stay, conditioned upon the debtor's compliance with the terms of the modified plan, and ordered the return of the vehicle to the debtor. Since Tidewater has advised the court of its intent to appeal that order (as well as the confirmation order, when it is entered), the court reserved the right to supplement its oral ruling with a written opinion, which follows.

### Facts

The facts are not in dispute. On January 22, 2001, Marlene Marie Moffett ("the debtor") purchased a used 1998 Honda Accord automobile from Hendrick Honda of Woodbridge, Virginia, under the terms of a Retail Installment Contract. Under

the contract, she agreed to pay $20,024.45 with interest at 19.95% per annum in 60 monthly installments of $534.66 each beginning March 8, 2001. Under the contract, the debtor granted the seller a security interest in the vehicle, all parts or goods put on it, and all proceeds. The contract provides that upon default, "we may take (repossess) the vehicle from you if we do so peacefully and the law allows it." The contract further states as follows:

> **e. How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.
>
> **f. We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle. We will apply the money from the sale, less allowed expenses, to the amount you owe.... If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us.

The contract was assigned by Hendrick Honda to Tidewater Motor Credit without recourse. A certificate of title issued by the Virginia Department of Motor Vehicles on February 13, 2001, shows the debtor as the owner of the vehicle and Tidewater Motor Credit as lienholder.

The debtor made payments for approximately a year, but then failed to make the March and April 2002 payments. On April 25, 2002, at approximately 2:00 a.m., Tidewater repossessed the vehicle. Later that same day, the debtor filed a voluntary chapter 13 petition in this court.[1] On May 1, 2002, her attorney faxed a notice of the bankruptcy filing, together with proof of insurance, to Tidewater, and demanded possession of the vehicle. Two days later, Tidewater filed its motion for relief from the automatic stay. Tidewater has taken no steps to dispose of the vehicle, nor has it applied for a certificate of title.

The debtor's original plan proposed to bifurcate Tidewater's claim into secured and unsecured components; to pay the secured portion at a reduced interest rate; and to pay the unsecured portion without interest at 100 cents on the dollar. The modified plan filed by the debtor on May 30, 2002, now proposes direct payments to Tidewater of the monthly payments due under the contract, with the existing $1,720.24 delinquency being cured by payments (including interest at 19.9%) through the trustee.[2] Although the plan has not yet been confirmed,[3] the debtor has begun making the direct monthly payments to Tidewater.

1. She had previously filed a chapter 7 case in this court on December 2, 1999, Case No. 99–15931–RGM, and received a discharge on March 18, 2000. Because the purchase of the Honda occurred well after the chapter 7 discharge, the concerns as to good faith sometimes associated with "chapter 20" filings, see, e.g., In re Cushman, 217 B.R. 470 (Bankr. E.D.Va.1998), are not raised in this case.

2. The plan does not specify the number of months over which cure payments are to be made. The plan itself extends for 60 months. The court assumes the chapter 13 trustee will schedule the payments to Tidewater over a relatively short period of time in order to reduce the interest expense to the bankruptcy estate, since Tidewater's is the only claim being paid interest.

3. Objections to confirmation have been filed by the debtor's mortgage company (James B. Nutter & Co.) and by the Internal Revenue Service. Counsel for Tidewater advises that Tidewater likewise intends to object to confirmation in order to preserve its objection to the court's ruling on the relief from stay motion.

The debtor has worked for the Federal Emergency Management Agency for approximately four years and lives approximately 40 miles from her office. The automobile was the means by which she traveled to her workplace, and she testified without contradiction that without a car her ability to earn an income and to make the payments required by her plan would be adversely affected. After the Honda Accord was repossessed, she was able to borrow a neighbor's car for a period of time, but then had to rent a car. The rental rate of $42 per day, however, is more than she can afford on a going-forward basis.

## Conclusions of Law and Discussion

### A.

The filing of a bankruptcy petition creates an automatic stay of any act to exercise control over, or to enforce a lien against, property of the estate. §§ 362(a)(3) and (4), Bankruptcy Code. It also stays any act to enforce a lien against property of the debtor to the extent the lien secures a prepetition claim. § 362(a)(5), Bankruptcy Code. On motion of the party stayed, the automatic stay may be annulled, terminated, modified, or conditioned for, among other grounds, "cause," which includes, but is not limited to, lack of adequate protection of an interest in property. § 362(d)(1), Bankruptcy Code.

The filing of a bankruptcy petition creates an "estate" that includes "all legal and equitable interests of the debtor in proper-

ty as of the commencement of the case" wherever located and by whomever held. § 541(a)(1), Bankruptcy Code.[4] This includes property that is subject to a lien as long as the debtor's right to redeem has not been foreclosed under applicable non-bankruptcy law. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Any entity that is in possession, custody, or control of property that the bankruptcy trustee may use, sell, or lease, is required to deliver it to the trustee, or account to the trustee for its value. § 542(a), Bankruptcy Code. In a chapter 13 case, the debtor has the power, exclusive of the trustee, to use, sell, or lease property of the bankruptcy estate. § 1303, Bankruptcy Code. However, where property has been lawfully repossessed by a secured creditor prior to the filing of the bankruptcy petition, the creditor is not required to return the property until the creditor has been provided adequate protection for its security interest, and the creditor does not violate the automatic stay by retaining the property pending a ruling by the bankruptcy court. *In re Young*, 193 B.R. 620 (Bankr.D.D.C.1996); *In re Massey*, 210 B.R. 693 (Bankr.D.Md. 1997).

### B.

The United States Supreme Court addressed the interplay of bankruptcy and state property law in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The narrow issue before the Court in *Butner* was whether a

---

4. The estate also includes property that, although not owned by the debtor on the date of the bankruptcy filing, is recovered by the trustee under the Bankruptcy Code's various avoidance provisions. §§ 541(a)(3) and (4), Bankruptcy Code. Property interests become part of the estate notwithstanding state law restrictions on assignability or contractual provisions that effect a forfeiture upon a

bankruptcy filing, § 541(c)(1), Bankruptcy Code. However, a debtor's interest in a valid spendthrift trust is excluded from the estate. § 541(c)(2). Additionally, where a debtor has only legal title but no equitable interest, the property becomes property of the estate only to the extent of the legal title. § 541(d), Bankruptcy Code.

mortgagee's security interest in real property located in North Carolina extended to post-petition rents and profits from the property. In rejecting the notion that property rights in bankruptcy are defined by a federal rule of equity, the Court observed that although Congress had *authority* under the Bankruptcy Clause of the Constitution to enact a statute addressing the issue, it had not done so. *Id.* at 54, 99 S.Ct. at 917. The Court then stated, "Property interests are created and defined by state law," and held, "*Unless some federal interest requires a different result,* there is no reason why such interests should be analyzed differently . . . in a bankruptcy proceeding." *Id.* at 55, 99 S.Ct. at 918 (emphasis added). Although *Butner* was decided under the former Bankruptcy Act of 1898, and although Congress has subsequently overruled the specific holding in *Butner* concerning post-petition rents, the continuing vitality of what has been termed "the *Butner* approach" to property interests appears unquestioned. *American Bankers Ins. Co. of Florida v. Maness,* 101 F.3d 358, 363 (4th Cir.1996), *citing Barnhill v. Johnson,* 503 U.S. 393, 397–98, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992).

It is important to note that the Supreme Court in *Butner* did not hold that state property law trumped or circumscribed Federal bankruptcy law. Rather, it established a default rule that state property law applied except where Congress had established a different rule by statute.

Following enactment of the Bankruptcy Code, the Supreme Court had occasion to address the Code's treatment of encumbered property. *United States v. Whiting Pools,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). In *Whiting Pools,* the Court held that tangible property levied on by the Internal Revenue Service prior to the filing of a chapter 11 petition remained property of the estate under Section 541 until sold to a bona fide purchaser at tax sale and was therefore subject to turnover under Section 542. In so holding, the Court noted that, while Congress could have written the Bankruptcy Code to protect secured creditors by completely excluding encumbered property from the bankruptcy estate, Congress instead chose to protect secured creditors by requiring "adequate protection" for their interests. *Id.* at 204, 103 S.Ct. at 2313. The Court analyzed the Code's treatment of encumbered property as follows:

> In effect, § 542(a) *grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings.* The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession.

*Id.* at 207, 103 S.Ct. at 2314–15 (emphasis added). Accordingly, under *Whiting Pools,* the reorganization estate includes property seized by creditors prepetition. *Id.* at 209, 103 S.Ct. at 2315; *see also Phillips v. Smith (In re Ayscue),* 123 B.R. 28, 30 (Bankr.E.D.Va.1990) (". . . a secured creditor who has obtained possession of the debtor's property prior to bankruptcy as part of the creditor's procedural remedy on default is still subject to the Trustee's power to compel turnover."); *TranSouth Financial Corp. v. Sharon (In re Sharon),* 234 B.R. 676, 682 (6th Cir. BAP 1999) (possession of the debtor's car was part of the bundle of rights that became "property of the estate" upon the filing of the Chapter 13 petition); *In re Greene,* 248 B.R. 583, 597 (Bankr.N.D.Ala.2000) (argument that the debtor's bankruptcy estate had no interest in a car repossessed pre-petition as a result of default and before disposition is untenable).

## C.

■ Tidewater argues, however, that courts commonly misconstrue the Supreme Court's ruling in *Whiting Pools* as a blanket holding that property repossessed prepetition is part of the bankruptcy estate, (Pl.'s Mem. at 9). According to Tidewater, the Supreme Court decided a turnover issue in *Whiting Pools*, not an ownership issue, and that as a result, the first step a court must take is to analyze who owns the collateral under state law. (Pl.'s Mem. at 10–11); *see* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). In this connection, Tidewater maintains that upon repossession it became the owner of the vehicle, and that the only property right retained by the debtor was not an interest in the vehicle, but merely an intangible right of redemption.[5] After examining Tidewater's argument, however, this Court determines that Tidewater's position is untenable under both Virginia law and the Bankruptcy Code.

According to Tidewater, Virginia law conclusively establishes that the vehicle should be excluded from the bankruptcy estate. Specifically, Tidewater claims that under Revised Article 9 of the Virginia Uniform Commercial Code, repossession transfers all material attributes of ownership in collateral from a debtor to the secured creditor, and that the debtor's only remaining interest in the vehicle— bare legal title—is then excluded from the estate under § 541(d) of the Bankruptcy Code.

After examining the relevant law, this court reaches the opposite conclusion. Tidewater is correct that § 8.9A–609, Code of Virginia, allows a secured creditor to repossess collateral after default. This right is also set forth in Clause 3(d) of the installment sales contract. (Pl.'s Ex. 1 at 2). However, neither the statute, nor the official comments to the statute, speak as to who owns the repossessed collateral. Rather, both the statute and the contract require additional steps to be taken before the debtor's rights to the collateral are extinguished. In particular, the secured party may dispose of the collateral only in a commercially reasonable manner, and even then, only after giving the debtor at least ten days notification of the intended disposition. Va.Code Ann. §§ 8.9A–610 through 612. In the case of a consumer-goods transaction, the notice must advise the debtor of the right to get the property back at any time before it is sold by paying the full amount owed. Va.Code Ann. § 8.9A–614. If the property is sold for more than the amount of the debt plus the reasonable expenses of retaking, holding, and disposing of the property, any surplus must be paid over to the debtor. Va.Code Ann. § 8.9A–615(d).

Tidewater points to § 8.9A–619, Code of Virginia, as supporting its position that repossession effectively extinguishes the debtor's title. The court, however, does not read the statute so broadly. The statute simply permits a secured party which has "exercised its postdefault remedies

---

5. In the motion for relief from stay, Tidewater also complained that the debtor's plan did not provide for the full payment of its claim. At oral argument on May 20, 2002, Tidewater's counsel took the position that there were only three methods by which the debtor could exercise her right of redemption: by paying "cash on the barrelhead"; by resuming payments on the contract and curing the arrearage through the plan; and by paying the full

amount due with interest through the plan. Presumably, debtor's counsel was listening, because the modified plan adopts the second course and does not attempt to "cram down" the secured creditor's claim. Since Tidewater conceded at oral argument that the debtor could do what she has now agreed to do, the court is mystified, to say the least, as to Tidewater's motive for appealing.

with respect to the collateral," as a result of which a *transferee* "has acquired the rights of the debtor," to execute a "transfer statement" (emphasis added). The transfer statement in turn entitles the transferee to "transfer the record of all rights of the debtor in the collateral . . . in any official filing, recording, registration, or certificate-of-title system." Va.Code Ann. § 8.9A–619(4)(b). However, the statute expressly provides that a transfer of record title *to a secured creditor* "is not of itself a disposition of collateral under this title and does not of itself relieve the secured party of its duties under this title." Va.Code Ann. § 8.9A–619(c). The official comments explain that the intended purpose of the transfer statement is simply to facilitate disposition of collateral:

> Potential buyers of collateral that is covered by a certificate of title (e.g., an automobile) . . . typically require as a condition of their purchase that the certificate or registry reflect their ownership. In many cases, this condition can be met only with the consent of the record owner. If the record owner is the debtor and, as may be the case after the default, the debtor refuses to cooperate, the secured party may have great difficulty disposing of the collateral.

UCC Comment (2) to § 8.9A–619. The official comment further states:

> Subsection (b) contemplates a transfer of record or legal title to a third party, following a secured party's exercise of its disposition or acceptance remedies under this Part, as well as a transfer by a debtor to a secured party prior to the secured party's exercise of those remedies. Under subsection (c), a transfer of record or legal title (under subsection (b) or under other law) to a secured party prior to the exercise of those remedies *merely puts the secured party in a position to pass legal or record title to a transferee at foreclosure.* A secured party who has obtained record or legal title retains its duties with respect to enforcement of its security interest, *and the debtor retains its rights as well.*

Official comment (2) to Va.Code Ann. § 8.9A–619 (emphasis added).

Thus, Tidewater's argument that § 8.9A–619(c) gives a secured creditor the right to acquire full title to the collateral *before* disposition is flatly contradicted both by the text of the statute and by the official comments. Additionally, it is not at all clear why Tidewater even raises this argument, given that Tidewater, as it candidly admits, did not execute a transfer statement following the repossession in this particular case or apply for a certificate of title in its own name. (Pl.'s Mem. At 16.)

**D.**

Even if this court were to accept Tidewater's construction of § 8.9A–619, its argument still fails to account for the debtor's right of redemption. Tidewater does not argue that repossession extinguishes the debtor's right of redemption, and the Virginia Uniform Commercial Code explicitly provides for one. Va.Code Ann. § 8.9A–623. Instead, Tidewater embarks on a detailed but specious argument construing the debtor's right of redemption as an intangible property right separate and distinct from any interest in the vehicle itself. In the process, Tidewater fails to distinguish between the concept of redemption from a *sale* and redemption from a *lien.*

Generally speaking, a "right of redemption" is the statutory right to "free property from the encumbrance of a foreclosure or other judicial sale, or to recover the title passing thereby, by paying what is due, with interest, costs, etc." Black's Law Dictionary 1325 (6th ed.1990). In its sup-

porting memorandum, Tidewater essentially equates the debtor's right under the UCC to redeem encumbered property from a lien with the more traditional notion of redemption from a sale (in jurisdictions that provide such a right). In so doing, it seeks to characterize the right to redeem as a mere "chose in action," an intangible personal property interest. This may be so in the context of redemption from a sale. However, the court is unpersuaded that the right to redeem from a lien does not constitute an interest in property.

The right or equity of redemption is not something that comes into existence only upon default. Rather, it is simply the right, inherent in any secured transaction, to release of the lien upon payment of the amount secured. Tidewater does not, nor could it, contend that the debtor, prior to repossession, had nothing more than an abstract right of redemption divorced from the vehicle itself. The debtor had both legal and equitable ownership of the vehicle, subject only to Tidewater's lien and its remedies upon default. Those remedies include the right upon default to peacefully take possession of the collateral and to sell it after notice in a commercially reasonable manner.[6] To be sure, lawful repossession of the vehicle deprives the debtor of perhaps the major incident of ownership, namely the immediate right to possession. But the immediate right of possession and ownership are not synonymous. Indeed, there are many kinds of secured transactions (a stock pledge, for example) in which the security interest is perfected by possession. It certainly could not be argued that possession of collateral solely for the purpose of perfecting a security inter-

est extinguishes the debtor's rights in the collateral. Perhaps most telling, both the installment sales contract[7] and the Virginia Uniform Commercial Code require that any surplus from the sale or other disposition of the collateral be paid to the debtor. Such a right is completely inconsistent with the notion that the debtor has no form of property interest in the collateral or at best only bare legal title. Put another way, if Tidewater upon repossession truly acquired *all* legal and equitable rights in the collateral, it is difficult to see how it could be compelled to account for a surplus upon subsequently disposing of it.

### E.

Tidewater's argument that Virginia's *motor vehicle registration statutes* and the case law construing them provide for transfer of title by operation of law after repossession is somewhat stronger but not ultimately convincing, primarily because the motor vehicle statute, if read that way, would conflict with the Uniform Commercial Code. The specific provision relied upon by Tidewater is Section 46.2–633, Code of Virginia, which provides as follows:

§ 46.2–633. **Transfer of title by operation of law.** Except as otherwise provided in § 46.2–615 *in the event of the transfer by operation of law* of the title or interest of an owner in and to a motor vehicle ... registered under the provisions of this chapter to anyone as legatee or distributee or as surviving joint owner or *by* an order in bankruptcy or insolvency, execution sale, sales as provided for in § 43–34, *repossession on default* in the performing of the terms of a lease or executory sales contract or of

---

**6.** The UCC allows a secured creditor after repossession to propose retaining the vehicle in satisfaction of the indebtedness. Va.Code Ann. §§ 8.9A–620 to 622. However, the in-

stallment sales contract in this case provides only for sale.

**7.** *See* Section 3(f), Pl.'s Ex. 1 at 2.

any written agreement ratified or incorporated in a decree or order of a court of record, or otherwise than by the voluntary act of the person whose title or interest is so transferred, the *transferee or his legal representative shall apply to the Department for a certificate of title,* giving the name and address of the person entitled to it, and accompany his application with the registration card and certificate of title previously issued for the motor vehicle ... if available, together with whatever instruments or documents of authority, or certified copies of them, are required by law to evidence or effect a transfer of title or interest in or to chattels in the case. *The Department shall cancel the registration of the motor vehicle, trailer, or semitrailer and issue a new certificate of title* to the person entitled to it.

Va.Code Ann. § 46.2–633 (emphasis added). Further, Section 46.2–615, Code of Virginia, titled "Period of validity of certificate of title," reads,

Every certificate of title issued under this chapter shall be valid for the life of the motor vehicle, trailer, or semi-trailer so long as the owner to whom it is issued shall retain legal title or right of possession of or to the vehicle.

Va.Code Ann. § 46.2–615.

■ Looking at these two sections of the Code in conjunction with the secured transaction provisions of the UCC, this court finds that the term "repossession," as used in Section 46.2–633, does not mean "instantly upon taking possession," but refers rather to the entire process that commences when the secured creditor takes possession and culminates when the collateral is disposed of after notice. For the reasons already discussed, repossession, under the statutory scheme set forth in the UCC, merely divests the debtor of the present right to use the vehicle, but does not immediately extinguish the debtor's title. If it did, Section 8.9A–619, providing for transfer of title, and Section 8.9A–623, providing for redemption of collateral before sale, would be surplusage. This is supported by the text of § 46.2–615, which states that the certificate title is valid so long as the person to whom title is issued retains legal title *or* possession.

The case law Tidewater presents in support of its theory that title transfers by operation of law upon repossession relies on dicta from *U.S. Fidelity & Guaranty Co. v. Trussell,* 208 F.Supp. 154 (W.D.Va. 1962), which involved a dispute over insurance coverage. However, *Trussell* is distinguishable on the facts from the present case. In *Trussell,* the agents of the finance company repossessing the debtor's automobile did so *with his permission.* Furthermore, at the time of repossession, they obtained a signed release and request for private sale from the debtor. *See id.* at 156. This fact was key to the court's finding that title to the vehicle was automatically acquired by the finance company after repossession under the predecessor to § 46.2–633. *See id.* at 160. Similarly, in *North River Insurance Co. v. Connecticut Fire Insurance Co.,* 233 F.Supp. 31 (W.D.Va.1964), *aff'd* 341 F.2d 913 (4th Cir. 1965), another dispute between insurers over automobile liability policies, the court cited *Trussell* in holding that repossession may result in transfer of title by operation of law. *See, id.* at 35.

Both *Trussell* and *North River* were decided before the Uniform Commercial Code took effect in Virginia, and thus neither opinion took account of its provisions. Virginia adopted the 1962 text of the Uniform Commercial Code, with some deviations, during the 1964 legislative session. Acts of Assembly, 1964, chap. 219. At that time, the General Assembly decided the UCC would take effect on January 1, 1966.

This was over a year and a half *after* the District Court released its decision in *North River*, and 11 months *after* the Circuit Court of Appeals affirmed the District Court's decision in that case as to the insurance company's liability in a per curiam opinion.[8] The District Court, in both *Trussell* and *North River*, cited to § 46.2–633's predecessor, the section of the Virginia Code dealing with transfer by operation of law.[9] Since Virginia's UCC had not yet taken effect, neither court mentions the UCC provisions that would be surplusage under its decision.

If title transfer were effective by operation of law upon the moment of repossession, it is hard to see how § 8.9A–623 (debtor's right to redeem) and § 8.9A–608(4) (debtor's right to surplus proceeds from sale) are not thereby rendered meaningless. The only result that makes sense, and is in accord with the official comments to § 8.9A–619 stating that a "transfer" to the secured creditor following repossession "merely puts the secured party in a position to pass legal or record title to a transferee at foreclosure" and that until that is done "the debtor retains its rights," is to read § 46.2–633 as simply recognizing that a transfer by operation of law occurs when the secured creditor, upon repossession, has disposed of the collateral (or retained it by agreement in satisfaction of the debt). Any certificate of title obtained by the secured creditor in the interim to facilitate a sale is merely provisional and does not extinguish or foreclose the debtor's equity of redemption in the vehicle.

### F.

■ Exercise of the right of redemption is precisely what the modified plan filed by the debtor on May 30, 2002, proposes to do. The amount claimed due by Tidewater on its proof of claim is $18,426.14. The proof of claim does not set forth an arrearage amount. Although the modified plan reflects a value of $15,625.00 for the vehicle, it does not propose to treat Tidewater's claim as undersecured or to modify its lien. Under the plan, the debtor will make the monthly installment payments of $534.36 due under the contract directly to Tidewater, while the delinquent payments—which the plan estimates at $1,720.74—will be paid through the plan with interest at 19.9%[10] from the payments made by the debtor to the chapter 13 trustee.

Tidewater cites two unpublished opinions from this district as holding that a debtor wishing to exercise his or her right to redeem a repossessed vehicle in a chapter 13 must do so by a lump sum payment of the full amount of the debt. Unpublished opinions, however, ordinarily do not have precedential value. Of course, even an unpublished opinion may be persuasive; however, neither of the opinions cited by Tidewater provide more than a cursory analysis of the issue.[11] More to the point,

---

8. The District Court for the Western District of Virginia's decision in the *North River* case is dated June 19, 1964. The per curiam opinion released by the Fourth Circuit affirming the result in *North River* is dated February 8, 1965.

9. The predecessor to § 46.2–633 in effect at that time was § 46.1–93. The text of that provision is for all intents and purposes the same as § 46.2–633.

10. The contract rate of interest is 19.95%. The court does not consider the difference to be significant.

11. One of them, indeed, appears to be inconsistent with a published opinion by the same judge. *See Brown v. Town & Country Sales and Service, Inc. (In re Brown)*, 237 B.R. 316 (Bankr.E.D.Va.1999) (car dealer violated automatic stay in chapter 13 case by not returning car that it had repossessed prepetition, when that had been its prior practice,

both opinions are contrary to, and do not distinguish, the only published decision on point in this district, namely *Anderson v. Associate Commercial Corp.*, 29 B.R. 563 (Bankr.E.D.Va.1983) (Shelley, J.).[12]

The fundamental flaw in Tidewater's argument is that it assumes a debtor's rights in bankruptcy—and in particular, the method by which a debtor may exercise a right of redemption in chapter 13—are limited to those allowed under state law. Nearly 20 years ago, the late Judge Blackwell N. Shelley of this court stressed that the right in chapter 13 to cure a default and to reinstate an accelerated note is granted by federal bankruptcy law, and that right cannot be frustrated by the law of any state. *Anderson*, 29 B.R. at 565, *citing In re Taddeo*, 685 F.2d 24, 28 (2nd Cir.1982). As Judge Shelley cogently observed, allowing debtors to cure a default even after repossession furthers the intent of Chapter 13, which is to facilitate the debtor's financial rehabilitation while protecting the rights of creditors. *Id.* This is entirely consistent with the Supreme Court's decision in *Butner*, which held that state law determines the debtor's property interests, but bankruptcy law determines the treatment of those interests. *Butner*, 440 U.S. at 55, 99 S.Ct. at 918.

*Anderson* is indistinguishable from the present case. The secured creditor in that case repossessed the debtor's truck prior to the filing of a chapter 13 petition. The debtor moved for turnover of the truck, and the secured creditor moved for relief from the automatic stay in order to sell the truck. Judge Shelley denied relief from the stay, conditioned upon the debtor resuming payments on the sales contract and curing all delinquent installment payments within 12 months of the confirmation of the debtor's chapter 13 plan. 29 B.R. at 566.

In the present case, there is no dispute that a right of redemption, even if that were the debtor's only right, is part of the bankruptcy estate. (Pl.'s Mem. at 21.) Therefore, the only question is what treatment the Bankruptcy Code allows for Tidewater's claim.[13] The Bankruptcy Code entitles the debtor to modify the rights of holders of secured claims. § 1322(b)(2), Bankruptcy Code. It also allows the debtor to cure a default. § 1322(b)(3), Bankruptcy Code. The proposed Chapter 13 plan in this case preserves Tidewater's lien, provides for direct payment of the regular installments coming due, and cures the delinquent installment payments within a reasonable period of time. The vehicle is insured, and the debtor has resumed making her payments. No argument has been made that the periodic payments under the installment contract are insufficient to compensate Tide-

---

12. Both unpublished opinions cite to *Anderson* but then misstate its holding by suggesting that it required a lump sum payment as a condition of redeeming. *Anderson*, to the contrary, is quite clear that in chapter 13 a debtor may exercise a right of redemption by deaccelerating the note, resuming payments, and curing the delinquent payments over time.

13. The court is aware of two reported decisions by the 11th Circuit (in one of which Tidewater was a prevailing party) that essen-

proof of insurance had been provided, and plan would pay secured claim in full).

tially adopt Tidewater's argument as to ownership of a repossessed vehicle. *Charles R. Hall Motors, Inc. v. Lewis (In re Lewis)*, 137 F.3d 1280 (11th Cir.1998) (applying Alabama law); *Bell–Tel FCU v. Kalter (In re Kalter)*, 292 F.3d 1350 (11th Cir.2002) (applying Florida law). In neither of those cases, however, did the debtor propose to pay the full amount of the debt through the chapter 13 plan. *Kalter*, 292 F.3d 1350, 1354–56 and n. 4. The *Kalter* opinion rather plainly implies that payment of the full amount due *through a chapter 13 plan* would constitute an effective "tender" for the purpose of redeeming the vehicle.

water for the decrease in the value of the vehicle resulting from the debtor's use of it. Tidewater's interest in the vehicle is therefore adequately protected as required by § 361, Bankruptcy Code. As in *Anderson*, the debtor needs the vehicle in order to earn a living. For the reasons persuasively articulated by Judge Shelley in *Anderson*, the court concludes that a chapter 13 plan which pays the secured creditor in full by resuming contract payments and by paying the delinquent installments within a reasonable period of time is a permissible method of redemption in chapter 13 and fully protects the secured creditor's rights.[14]

As noted, a separate order has been entered denying relief from the automatic stay and directing turnover of the vehicle.

---

14. The court stresses that its holding in this case is expressly limited to situations in which the debtor's chapter 13 plan provides for full payment of the debt secured by the repossessed collateral. A "cramdown" plan which bifurcates the creditor's claim into secured and unsecured components and pays less than the full amount of the debt presents a more difficult issue and would require the court to go substantially beyond the holding in *Anderson*. The court declines to do so until that issue is squarely presented.