**In re Renee STUPKA, Debtor.**

**Renee Stupka, Plaintiff,**

**v.**

**Great Lakes Ed., et al., Defendants.**

**Nos. 02–3446, 02–36514.**

United States Bankruptcy Court, N.D. Ohio.

July 25, 2003.

Order Denying Reconsideration Aug. 29, 2003.

Joseph W Westmeyer, Jr., Toledo, OH, for Plaintiff.

Matthew J Thompson, Columbus, OH, for Student Marketing Assoc. and ECMC.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff/Debtor's complaint to determine the dischargeability of certain student-loan obligations owed to the Defendant/Creditor, Educational Credit Management Corporation. At the Trial, the Parties were afforded the opportunity to present evidence and make any arguments that they wished the Court to consider in reaching its decision. The Court has now the opportunity to review all of the arguments of counsel, the evidence presented at Trial, as well as the entire record of this case. Based upon that review, and for the following reasons, the

Court finds that the Debtor's student-loan obligations are nondischargeable under the "undue hardship" standard of 11 U.S.C. § 523(a)(8). However, the Court also finds, based upon the circumstances as set forth in this Opinion, that the Debtor is entitled to receive a partial discharge of her obligations in accordance with this Court's equitable powers set forth in 11 U.S.C. § 105(a).

## FACTS

The Plaintiff/Debtor, Renee A. Stupka, (hereinafter the "Debtor") is a single woman, 42 years of age. The Debtor is college educated, and holds a law degree from the University of Toledo. In terms of health, the Debtor testified that she suffers from bipolar disorder. Due to the disorder, the Debtor complains of large "highs" followed by bouts of depression. Furthermore, the Debtor complains of migraine headaches, stomachaches and weight loss. The Debtor's disorder was diagnosed in 1998, but the Debtor testified that in the year 2000, the condition became especially severe, and has remained severe. Currently, the Debtor sees a therapist on a biweekly basis, and attends a bipolar support group twice a month. To address the disorder, the Debtor has been on anti-psychotic and anti-depressant medication for five years.

The Debtor has one child who is seven years of age, named Kaitlyn. At the time of Trial, the father had temporary custody of Kaitlyn. However, as the facts were presented at Trial, the Debtor will receive custody of her child in August of 2003, pursuant to a juvenile court decision which found that the Debtor's mental disorder did not interfere with her ability to care for her child. Once the Debtor receives custody of her child, she will become entitled to receive Six Hundred dollars ($600.00) a month in child support.

In the years 1999 and 2000, the Debtor, who worked as an attorney, had an income of Thirty-seven Thousand Four Hundred Sixty dollars ($37,460.00) and Thirty Thousand Two Hundred Four dollars ($30,204.00), respectively. In addition, this income was supplemented by withdrawals taken from the Debtor's IRA accounts; the amount of these withdraws totaled Fifty-one Thousand Two Hundred Twenty-seven dollars ($51,227.00). (Plaintiff's Ex. J & I) In 2001, the Debtor realized a net loss of Seven Thousand Eight Hundred Twenty-three dollars ($7,823.00) from her law practice, which was partially offset by Five Thousand Two Hundred Fifty dollars ($5,250.00) in unemployment benefits. (Plaintiff's Ex. B). In the beginning of 2002, the Debtor stopped working as an attorney; according to the Debtor the bipolar disorder prevented her from retaining focus, which made practicing law utterly impossible. In addition, the Debtor explained that due to her illness, her law license has been placed in suspension.

Presently, the Debtor is employed part-time (10–15 hrs. per week) at an agency that provides housing to persons with mental illness. The Debtor's duties, which in no way utilize her law degree, include inspection of houses and minor clerical work. It was, however, indicated by the Debtor that she may lose this part-time job as she has had trouble keeping pace with the work load and has been told that she has not been compassionate enough to people's needs. At the time of Trial, the Debtor earned about Sixty dollars ($60.00) per week. In addition, her current income is supplemented by Social Security Benefits totaling One Thousand Two Hundred Sixty-eight dollars ($1,268.00) per month.

As for the Debtor's expenses, the Debtor testified that her total monthly expenditures are Two Thousand Two Hundred Seventy-six and 20/100 dollars ($2,276.20),

plus annual payments of Nine Hundred Twenty-five dollars ($925.00) in property taxes, Six Hundred Ninety-six dollars ($696.00) in car insurance, and Four Hundred Forty-three dollars ($443.00) in home insurance. Furthermore, upon cróss examination, the Debtor revealed that she owns a "Time–Share" in Florida, and is required to make maintenance payments of Three Hundred dollars ($300.00) every other year, the last payment of which was paid by her father. As recently as last year the Debtor visited this property with her daughter. The Debtor explained that she has attempted to sell the time share; however, during the attempted sale, the Debtor claims that she lost Six Hundred dollars ($600.00) to a realtor and, as a result, she testified that she will no longer try to sell the property.

As of the date of Trial, the amount of student-loan debt at issue totaled Ten Thousand Two Hundred Eleven dollars ($10,211.00). This debt was originally held by Great Lakes Higher Educational Corporation/Sallie Mae, but the loan was later assigned to Educational Credit Management Corporation who is the Defendant in the current action (hereinafter referred to as the "Defendant"). The student-loan debt was used exclusively to finance her education at the University of Toledo College of Law. In this regard, it was brought to the Court's attention that the Debtor has paid all her undergraduate loans which totaled approximately Fifteen Thousand dollars ($15,000.00). Furthermore, the evidence shows that from June 1997 to March 2001 the Debtor made payments of One Hundred Eighty-five dollars ($185.00) per month on her law school debt, the funds of which, at least in part, came from the IRA withdrawals mentioned above. However, upon questioning by the Defendant, it was revealed that, since defaulting on her obligation, the Debtor has never made any attempt to work with what is known as the "Income Contingent Repayment Program," which calculates payments entirely from a debtor's income.

On September 27, 2002, the Debtor filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. In her petition, the Debtor's student-loan obligations constituted approximately 16% of her total unsecured debt. In addition, the Debtor disclosed in her bankruptcy petition, and further testified to the fact that she chose to reaffirm on both her car and house to avoid foreclosure. With respect to these affirmation agreements, the Debtor agreed to pay Six Hundred Three and 04/100 dollars ($603.04) per month for the house, and Two Hundred Thirty-two and 94/100 Dollars ($232.94) per month for her car.

### *LAW*

**11 U.S.C. § 523. Exceptions to Discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

### *DISCUSSION*

Under 28 U.S.C. § 157(b)(2)(I), a determination as to the dischargeability of a particular debt is a core proceeding. Thus, this matter is a core proceeding.

For reasons of public policy, Congress chose to exclude from the scope of a bankruptcy discharge, those debts incurred by a debtor to finance a higher education. In enacting this exception to discharge, however, Congress recognized that some student-loan debtors were still deserving of the fresh-start policy provided by the Bankruptcy Code. As a result, Congress provided that a debtor could be discharged from their educational loans if it were established that excepting the obligations from discharge would impose an "undue hardship" upon the debtor and the debtor's dependents. *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 196 (Bankr.N.D.Ohio 2000).

As used in § 523(a)(8), however, the term "undue hardship" is not actually defined. As a result, various tests have been developed by the courts to determine whether "undue hardship" exists under any given set of factual circumstances. In this regard, this Court, in accord with those prior decisions rendered by the Sixth Circuit Court of Appeals, has employed what has become known as the Brunner Test to determine whether a debtor is entitled to an "undue hardship" discharge of his or her student-loan obligations. *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356 (6th Cir.1994); *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir.1998).

 Under the Brunner Test, a debtor must establish that the following elements are in existence in order to have a student debt discharged under § 523(a)(8):

(1) The debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependants if forced to repay the loans.

(2) Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and

(3) The debtor has made a good faith effort to repay the loans.

*Brunner v. New York State Higher Educ. Serv. Corp.* 831 F.2d 395 (2nd Cir.1987). With respect to this Test, it is the debtor's burden to establish, by a preponderance of the evidence, that each of these elements has been met. *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 197 (Bankr.N.D.Ohio 2000). As applied to this case, the Debtor has clearly met her burden under the first prong of the Brunner Test, given that even upon receiving child support in August of 2003, the Debtor's monthly income will still be below Two Thousand dollars ($2,000.00), while the Debtor's reasonable monthly expenditures, barring any major change, will remain in excess of Thousand Two Hundred dollars ($2,200.00). Accordingly, the Court will begin its analysis with the second prong of the Brunner Test.

 The second prong of the Brunner test requires that there exist additional circumstances which indicate that the debtor's distressed state of financial affairs is likely to persist for a significant portion of the student-loan repayment period. Implicit in this requirement is the concept that the debtor's distressed state of financial affairs be the result of events which are clearly out of the debtor's control; that is, the debtor must establish that they have done everything in their power to improve their financial situation. *Berry v. Educ. Credit Mgmt. Corp. (In re Berry)*, 266 B.R. 359, 365 (Bankr.N.D.Ohio 2000). The clear purpose of this requirement is to ensure that the hardship the debtor is experiencing is actually "undue." *Miller v. U.S. Dep't of Educ. (In re Miller)*, 254 B.R. 200, 204 (Bankr.N.D.Ohio 2000).

In this case, the Debtor relies on the debilitating nature of her bipolar disorder to establish that her financial condition is unlikely to improve. In *Green v. Sallie Mae Servicing Corp. (In re Green)*, 238 B.R. 727, 735 (Bankr.N.D.Ohio 1999), this Court found that bipolar disorder, if sufficiently severe and unlikely to improve, can interfere with a debtor's ability to improve their financial situation. Other courts have generally held the same. *Kelsey v. Great Lakes Higher Ed. Corp. (In re Kelsey)*, 287 B.R. 132 (Bankr.D.Vt.2001) (severe, debilitating and longstanding bipolar mental disorder from which debtor suffered supported grant of undue hardship discharge); *Thomsen v. Dept. of Education (In re Thomsen)*, 234 B.R. 506 (Bankr.D.Mont.1999) (second prong of the Brunner Test may be established by showing existence of psychiatric problems, such as bipolar disorder, which rendered debtor permanently disabled).

As it relates to the severity and long-term nature of her disorder, the facts of this case indicate that the Debtor has been on anti-psychotic and anti-depressant medications for the last five years. In addition, the Debtor presented as evidence a report by a psychiatrist which reiterated the serious nature of her bipolar disorder. Although more evidence would have been helpful in this regard, the Court, based upon this evidence, finds credible the Debtor's assertion that she is presently incapable, and will likely for the foreseeable remain incapable, in maintaining any sort of employment of a significant remunerative nature. In this regard, it is specifically noted that the Debtor's bipolar disorder has become progressively worse, which, in turn, has reflected negatively on her annual income. For example, in the year 2000, the Debtor's annual income from her law practice totaled Twenty-eight Thousand One Hundred Fifty-one dollars ($28,151.00). In contrast, a year later, the Debtor's law practice generated no income, instead realizing a Seven Thousand Eight Hundred Twenty-three dollar ($7,823.00) net loss. Finally, at the beginning of the year 2002, the Debtor's law practice ceased to exist entirely. Thus, having established her burden under the first two prongs of the Brunner Test, the Court will now turn its analysis to the third prong of the Test, which asks whether the Debtor made a "good faith" effort to repay the loan.

The purpose of the "good faith" prong of the Brunner Test is twofold: (1) to ensure that a debtor acts responsibly toward the creditor given that credit was extended without regards to the debtor's creditworthiness; and (2) to ensure that the debtor acted responsibly in minimizing expenses, maximizing income and securing employment. *See Coveney v. Costep Servicing Agent (In re Coveney)* 192 B.R. 140, 144 (Bankr.W.D.Tex.1996); *In re Flores* 282 B.R. 847 at 856; Raymond L. Woodcock, *Burden of Proof, Undue Hardship, and Other Arguments for the Student Loan Debtor Under 11 U.S.C. § 523(a)(8)(B)*, 24 J.C. & U.L. 377 at 418–419; Jeffery L. Zackerman, *Discharging Student Loans in Bankruptcy: The Need for a Uniform Test*, 65 U. Cin. L.Rev. 691 at 715. Given these dual purposes, all the following factors have been considered relevant to the determination of whether a debtor made a good faith effort to repay his/her student-loan obligation:

(1) Whether the debtor has made an attempt at obtaining suitable employment;

(2) whether the debtor has made any attempts to repay the student-loan debt;

(3) the length of time after the student loan becomes due that the debtor seeks to discharge the debt;

(4) whether the financial situation is outside the debtor's control;

(5) the percentage of the student-loan debt in relation to the debtor's total indebtedness;

(6) whether the debtor obtained any tangible benefit from the loan;

(7) whether the debtor has made the best efforts necessary to minimize expenses.

*See Bruen v. United States (In re Bruen)*, 276 B.R. 837, 843–44 (Bankr.N.D.Ohio 2001); *In re Flores* 282 B.R. 847, 856; *Miller v. U.S. Dep't of Educ. (In re Miller)*, 254 B.R. 200, 205 (Bankr.N.D.Ohio 2000); *In re Green* 238 B.R. 727, 736 (Bankr.N.D.Ohio 1999).

 With respect to the above factors, a few clearly fall in the Debtor's favor. For example, in compliance with the first factor, the Debtor is currently employed part-time. Even more important, in conformance with the second consideration, the Debtor, in addition to paying off her undergraduate loan obligations, did manage to pay from June 1997 to March 2001 One Hundred Eighty-five dollars ($185.00) per month toward her existing student loans, having met this obligation, at least in part, by making withdrawals from her IRA account. Moreover, in conformity with the fifth consideration, there is no evidence that the Debtor filed bankruptcy to solely discharge her student-loan obligations as this debt comprised just 16% of her total unsecured debt. Set against these factors, however, are three less favorable considerations that suggest that the Debtor has not made a "good faith" effort to repay her obligations.

 First, while payments were made on the existing loan from June 1997 to March 2001, the Debtor, after she defaulted on her obligation, never made any attempt to work with the "Income Contingent Repayment Program." The Court considers this significant because of the nature of this program which, in *Swinney*

*v. Academic Financial Services*, was explained by this Court as follows:

The federal income contingent repayment program is a device which allows student-loan debtors, who have little or no income, a means by which to pay their student loan obligations. In greater detail, the program can be explained as this: a borrower may qualify for an Income Contingent Repayment Plan, where the amount of the required monthly payment is recalculated yearly based on the borrower's Adjusted Gross Income, family size and the "poverty guidelines" promulgated by the United States Department of Health and Human Services. The repayment period covers a maximum of 300 months. The amount of payments are dependent on the borrower's income and payment may not be required at all during times when the borrower has little income. The balance remaining after the 300-month period is deemed forgiven.

266 B.R. 800, 806 (Bankr.N.D.Ohio 2001). Thus, given the income-contingent nature of this program, it has been the policy of this Court to strongly scrutinize a debtor who fails to even make an attempt to participate in the program. Stated differently, a debtor who fails to at least attempt to participate in the "Income Contingent Repayment Program," carries a heavy burden to establish that they have complied with the "good faith" prong of the Brunner Test. *See Swinney v. Academic Financial Services (In re Swinney)* 266 B.R. 800 at 807 (Bankr.N.D.Ohio 2001) (commenting that a debtor with little or no income is only required to make negligible payments under the program, thus this option should be at the very least be pursued before a discharge in bankruptcy is sought); *McLeod v. Diversified Collection Services (In re McLeod)*, 176 B.R. 455 (Bankr.N.D.Ohio 1994) (holding that the

debtor did not act in good faith where he failed to negotiate repayment before seeking a discharge of his student-loan obligation is bankruptcy); *In re Phillips* 161 B.R. 945, 948 (Bankr.N.D.Ohio 1993) (holding that a debtor's failure to seek the less drastic remedy of deferment payments before attempting to discharge the loan in bankruptcy evidenced a lack of good faith). Courts from other jurisdictions also generally agree with this principle. *See In re Brunner* 831 F.2d 395 at 397 (finding among other factors that the debtor lacked good faith because she made no attempt to request a deferment payment on her loan); *U.S. Dep't. of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 177 (Bankr. C.D.Cal 2000) (reversing the discharge of a debtor's student-loan obligation, given evidence of the debtor's lack of diligence in pursuing repayment options throughout his bankruptcy proceeding). Moreover, the attempted participation in the "Income Contingent Repayment Program" is especially important in a case such where the obligation is not especially large in amount—i.e., around $10,000.00—as even minimal payments can make a significant impact on the debt.

Second, despite her current mental disorder, the Debtor has obtained a financial benefit from her student loans. In particular, while not currently practicing law due to her bipolar disorder, the fact remains that the Debtor's law license has not been surrendered, and may be reactivated upon meeting certain prerequisites.

Finally, there is evidence that the Debtor has not use her best efforts to minimize her expenses. Of particular noteworthiness, the Debtor testified that she owns a "Time Share" in Florida, which she and her daughter recently visited. Although in 2002 the maintenance payment for the property was paid by her father, this nevertheless freed up funds that otherwise could have been used to pay a portion of her student-loan debt. Moreover, by the Debtor's own admission, the value of the property is low, thereby raising the question as to why the Debtor didn't simply cease making the maintenance payments on the property as any liability for this obligation was discharged in bankruptcy. *See* 11 U.S.C. § 727(b).

▉ Accordingly, based on the three reasons stated above, the Court, although finding it a close call, holds that the greater weight of the evidence supports the conclusion that the Debtor did not act in "good faith" toward the repayment of her student-loan obligation; accordingly no "undue hardship" discharge is warranted in this case. It is, however, the practice of this Court that a debtor not otherwise entitled to an "undue hardship" discharge under § 523(a)(8) may still be entitled to some relief such as a partial discharge from their student-loan obligations. *See Fraley v. U.S. Dept. of Educ. (In re Fraley)*, 247 B.R. 417 (Bankr.N.D.Ohio 2000), *In re Flores* 282 B.R. 847. The authority for this is found in 11 U.S.C. § 105(a), which provides, in relevant part, that a bankruptcy "court may issue any order, process, or judgment that is necessary to carry out the provisions of this title." In *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)* 144 F.3d 433, 438–39 (6th Cir.1998), the Sixth Circuit Court of Appeals specifically approved of this practice when it stated:

Although the bankruptcy court should not have discharged the ... entire student loans, we believe it had the power to take action short of total discharge. We find this authority in 11 U.S.C. § 105(a), which permits the bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," so long as such act is consistent

with the Bankruptcy Act. In a student-loan discharge case where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden in the debtor, an all-or-nothing treatment thwarts the purpose of the Bankruptcy Act.

144 F.3d 433, 438–439 (6th Cir.1998) (internal citations omitted).

However, before this Court will invoke its equitable powers under § 105(a), it must find that the equities of the situation tip distinctly in favor of the debtor. *In re Flores* 282 B.R. 847, 857, *Swinney v. Academic Fin. Serv. (In re Swinney)* 266 B.R. 800, 806 (Bankr. N.D.Ohio 2001). A primary concern in this regard, given the equitable nature of § 105(a), is whether the debtor, in seeking relief from this Court, acted fairly with respect to their student loan. *In re Flores* 282 B.R. 847, 857.

As it pertains thereto, this Court has already found that the Debtor failed to sustain her burden under the "good faith" prong of the Brunner Test. In turn, it is self-evident that many of the same considerations applicable to the "good faith" standard of the Brunner test are similarly applicable to the equitable standard of § 105(a). As a result, a debtor whose actions are completely devoid of any indicia of good faith would not be entitled to receive an equitable adjustment of their student-loan debt. Nevertheless, the equitable standard of § 105(a) and the "good faith" standard of the Brunner Test are not identical. Thus, a debtor who can point to sufficient indicia of good faith may still, even though not meeting the Brunner standard of "good faith," be entitled to have their student-loan obligations equitably adjusted under § 105(a).

With this in mind, the Court's attention naturally turns to its previous holding which found that many of the Debtor's actions were representative of a person who had acted in good faith with respect to their student loans. In fact, while ultimately concluding that the Debtor did not meet the "good faith" standard of the Brunner Test, it was nevertheless deemed to be a "close call." Given therefore the close nature of this decision, the Court finds that the Debtor is a prime example of a person who, despite failing to sustain their burden under "good faith" prong of the Brunner Test, is still entitled to receive an equitable adjustment of their student-loan obligations.

As for the type of relief, the Court, in considering the relatively low amount of the student-loan debt at issue, together with the Debtor's income and expenses, finds it equitable to establish the Debtor's nondischargeable student-loan debt at Seven Thousand Five Hundred dollars ($7,500.00). The Court further finds it equitable to require that this obligation be paid in minimum monthly installments of Forty-five dollars ($45.00), with the first installment becoming due exactly one year after the date that this opinion is entered, and continuing thereafter until the obligation is paid in full. In addition, while this obligation is being repaid, no interest shall accrue thereon. Notwithstanding, given that the Debtor did not sustain her burden under the "good faith" prong of the Brunner Test, the Court also finds it appropriate to subject this decision to this particular caveat: If the Debtor fails to make any payments provided for herein, the original amount of her student-loan obligation will, including interest that otherwise would have accrued, become a nondischargeable debt.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of coun-

sel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

ORDERED that the student-loan obligations of the Plaintiff, Renee Allison Stupka, to the Defendant, Educational Credit Management Corporation, be, and are hereby, determined to be nondischargeable debts in bankruptcy pursuant to 11 U.S.C. § 523(a)(8).

It is **FURTHER ORDERED** that the Plaintiff's nondischargeable student-loan obligation to the Defendant be, and is hereby, determined to be Seven Thousand Five Hundred dollars ($7,500.00) pursuant to 11 U.S.C. § 105(a). Further, while in repayment, no interest shall accrue on this obligation.

It is **FURTHER ORDERED** that the Plaintiff make voluntary payments of at least Forty-five dollars ($45.00) per month. Such payments shall first become due on the first anniversary of the issuance of this Decision, and shall continue each month thereafter until the obligation is paid in full. Nothing in this order, however, prevents the Plaintiff from paying her obligation earlier.

It is **FURTHER ORDERED** that if the Plaintiff fails to make any of the payments as provided for herein, the entire amount of the Plaintiff's original student loan debt, including interest and other charges that otherwise would have accrued, will become a Nondischargeable Debt.

It is **FURTHER ORDERED** that the Defendant provide to the Plaintiff an address as to where payments on the Plaintiff's nondischargeable obligation may be tendered.

## DECISION AND ORDER ON MOTION FOR RECONSIDERATION

This cause comes before the Court after a Hearing on the Plaintiff/Debtor's Motion for Reconsideration of this Court's Memorandum Opinion and Decision dated July 25, 2003. In her Motion, it is the Debtor's position that the Court erred when, although granting her a partial discharge under 11 U.S.C. § 105(a), the Court denied the Debtor a full discharge of her student-loan obligations for failing to meet the "undue hardship" standard of 11 U.S.C. § 523(a)(8). In attendance at the Hearing was the Debtor, Joseph Westmeyer, Jr. as counsel for the Debtor, and Matthew Thompson, as counsel for the Defendant, Educational Credit Management Corporation.

It is well-established that a "motion for reconsideration," not being expressly recognized by either the Federal Rules of Procedure or the Bankruptcy Rules of Procedure, is treated as either a Motion to Alter or Amend under Rule 59, or a Motion for Relief from Judgment under Rule 60(b). *Melton v. Melton (In re Melton)* 238 B.R. 686, 694 (Bankr.N.D.Ohio 1999). Under which Rule the motion falls turns on the time at which the motion is filed: If the motion is served within ten days of the rendition of judgment, the motion falls under Rule 59; if it is served after that time, it falls under Rule 60(b). In this case, the Debtor's Motion for Reconsideration was filed seven days after the entry of this Court's Memorandum Opinion and Decision. Accordingly, the Debtor's Motion will be addressed under the standard set forth in Rule 59 of the Federal Rules of Civil Procedure, which is made applicable to this proceeding by Bankruptcy Rule 9023.

In order to sustain a Rule 59 Motion, it must be shown that the court made a mistake, either factually or legally. *Innovative Home Health Care. Inc. v. P.T.–O.T. Associates of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir.1998). As it relates thereto, the Debtor called this

Court's attention to what she perceived as two points of misunderstanding. First, the Debtor pointed out that contrary to a statement made in this Court's Memorandum Opinion and Decision, she did not actually default on her student-loan obligations, but had instead obtained deferments. Second, in addressing this Court's concern that she never attempted to participate in what is known as the Income Contingent Repayment Program, the Debtor set forth that "she was never made aware of its existence." (Doc. 19, at pg. 2).

From a technical standpoint, the first point raised by the Debtor is correct: the Debtor, contrary to what was stated in this Court's Opinion, did not actually default on her student-loan debts, but instead had obtained deferments. Nevertheless, not all factual mistakes require the alteration or amendment of a court order; rather, before the mischaracterization of a factual matter will sustain a Motion made under Rule 59, it must be shown that the error materially affected the correctness of the judgment. *Matter of Prince*, 85 F.3d 314, 324 (7th Cir.1996) (motion to alter or amend requires that there exist a manifest error of law or fact). In this case, however, this standard has not been met as it is clear from its context that this Court's decision did not hinge, much less seriously consider the distinction between "default" and "deferment." In fact, the issue of "default" is only raised one time in this Court's Opinion, and then only in passing. Instead, this Court's use of the word "default" was simply meant to signify that regardless of the particular circumstances, the Debtor had, for a period of time, failed to make payments on her student-loan debt.

Similarly, the Debtor's second point, concerning her lack of knowledge of the Income Contingent Repayment Program, is deficient, both legally and factual-

ly. First, from a legal perspective, the Debtor's lack of knowledge of the Income Contingent Repayment Program is being raised for the first time; a motion to alter or amend, however, does not permit a party to advance an argument that could have been presented prior to the rendition of the judgment. *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726 (7th Cir.1999). Regardless, from a factual viewpoint, the standard of "undue hardship" under § 523(a)(8) contemplates that a debtor will at least explore alternate payment options for his or her student-loan debt. Thus, a debtor's ignorance of alternate payment options is anything but a positive factor. *See Alderete v. Colo. Student Loan Program for the State of Colo. (In re Alderete)*, 289 B.R. 410, 419–20 (Bankr.D.N.M. 2002) (debtor's failure, until after commencement of case, to investigate payment plan that would significantly reduce payments, factored into issue of good faith). This is especially true in this case considering that the Debtor is an attorney, and thus was thoroughly competent to investigate alternate payment options. *See Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 198 (Bankr.N.D.Ohio 2000) (a sophisticated debtor's failure to explore all avenues available for financial help may be considered in a good faith analysis).

In addition to the above, the Debtor, at the hearing held in this matter, sought to explain a couple of other matters which the Court had previously found reflected negatively on her "good faith" effort to repay her student-loan obligations. Namely, the Debtor explained that she did not give up her law license because of the time she had invested in the profession, and the Debtor related to the Court that she has maintained an interest in a timeshare because taking a trip thereto allowed her quality time with her child. Both of these state-

ments, however, lack sufficient persuasive force to change this Court's prior decision.

First, the Debtor's former statement does not change the fact that, as set forth in this Court's Memorandum Opinion and Decision, the Debtor has still retained a tangible benefit from her student-loan obligations. Secondly, the latter point made by the Debtor lacks persuasive strength as many people, in order to pay their student-loan obligations, forego activities that they would otherwise like to undertake. In fact, one of the foundations of the "undue hardship" standard of § 523(a)(8) is that a debtor, despite having made major sacrifices in their lifestyle, is still unable to pay their student loans. In this regard, while the Court can appreciate the Debtor wanting to spend quality time with her child, there are surely other ways this can be accomplished—e.g., trips to the park, activities around the home.

Also at the hearing held in this matter, the Debtor reiterated and expanded upon a number of factual items originally brought forth at the Trial held in this case. In this regard, the Debtor emphasized four particular points: (1) her mental illness has not improved; (2) she now has custody of her child, for whom she receives minimal support; (3) she has come close to losing her part-time job; and (4) due to a confluence of circumstances, her personal, out-of-pocket expenses will increase for the drugs she takes on account of her mental illness.

Although not questioning the veracity of the above statements, such statements clearly only relate to the first and second prongs of the Brunner Test—that is, whether the circumstances surrounding a debtor's inability to pay a student loan will likely persist for a significant period of time The Court, however, has already held that the Debtor met her burden under prongs one and two of the Brunner Test.

Instead, solely at issue in the Debtor's Motion to Reconsider was whether this Court should revise its holding so as to find that the Debtor acted in "good faith" vis-a-vis her student-loan obligations as is required under the third and final prong of the Brunner Test. As such, the above points, not directly relating to the issue of "good faith," must be discounted.

Based therefore on the reasons set forth above, the Court declines to alter its prior decision rendered in this matter. However, before concluding, the Court would like to address one issue which was not previously discussed in this Court's prior Memorandum Opinion and Decision.

The Debtor's underlying basis for seeking an "undue hardship" discharge of her student-loan debts rests entirely upon her contention that her mental illness is severely debilitating. In this respect, the Court's acceptance of the debilitating nature of the Debtor's illness was crucial in this Court's decision to exercise its equitable powers under § 105(a) so as to effectuate a partial discharge of the Debtor's student-loan obligations. However, as pointed out in this Court's prior Memorandum Opinion and Decision, very little collaborating evidence was offered concerning the debilitating nature of the Debtor's mental illness. Furthermore, and although not actually addressed in this Court prior discussion on the matter, this lack of corroborating evidence becomes especially problematic given that the Debtor also contends that she is completely competent to care for her minor child, for whom she now has complete legal custody. Thus, what the Debtor has, in essence, proposed is this: her mental illness, while not so severe so as to render her unfit to be a custodial parent, is of sufficient severity so as to prevent her from obtaining any sort of employment which would enable her to pay a relatively low student-loan

debt (i.e., $7,500.00 at no interest at the monthly rate of just $45.00). These two positions, while not necessarily opposed to one another, do have a large degree of incongruity. Nevertheless, the Court, like those other matters discussed above, will not second–guess its prior decision concerning the severity of the Debtor's mental illness.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

***ORDERED*** that the Motion of the Plaintiff/Debtor, Renee Stupka, for Reconsideration of this Court's Memorandum Opinion and Decision dated July 25, 2003, be, and is hereby, DENIED.