**In re Branwen LOWE, Debtor.**

**Branwen LOWE, Plaintiff,**

v.

**ECMC, Defendant.**

**No. 03–3376.**

United States Bankruptcy Court,
N.D. Ohio.

Sept. 9, 2004.

## MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff/Debtor's Complaint to Determine Dischargeability. At issue at the Trial was whether the Debtor was entitled to receive a discharge of those obligations she incurred to finance her higher education pursuant to the "undue hardship" standard set forth in 11 U.S.C. § 523(a)(8). After considering the evidence presented at the Trial, as well as the arguments made by the Parties, the Court, for the reasons set forth herein, declines to grant the relief requested by the Debtor.

## FACTS

The Debtor/Plaintiff, Branwen Lowe, is a divorced woman, 33 years of age. She has two children, ages 17 and 13, for whom she has legal custody. As legal custodian, the Debtor receives monthly support payments from the respective fathers of the children: $300.00 for the older child; and approximately $600.00 for the younger child, part of which is based upon payment for an arrearage of over $13,000.00.

On July 29, 2003, the Debtor filed a voluntary petition in this Court for relief under Chapter 7 of the Bankruptcy Code. Included in her petition were those obligations the Debtor incurred to finance her higher education. These loans were incurred by the Debtor during the 1990's to finance her undergraduate work in psychology, for which she received a B.A., and some postgraduate studies. For purposes of the Trial held in the matter, it was established that the principal amount of her educational loans was $42,333.00, with a present outstanding balance, due to accruing interest and the imposition of various finance charges, of over $80,000.00.

At the present time, the Debtor is employed by a government agency as a vocational specialist, a position she has maintained for the past five years. In this position, the Debtor's monthly salary is $2,560.00 which, after accounting for mandatory deductions, amounts to $2,125.96 in net monthly income. In addition to her salary, the Debtor is accorded with certain employee benefits; primarily, health insurance, participation in a public employee retirement system, and the opportunity to receive periodic pay increases. Although not presently, the Debtor has also in the past supplemented her income by working a part-time job.

Set against her gross monthly income, the Debtor put forth that her necessary living expenses, which totaled $3,330.00, exceeded her income. While not a complete list, itemized in this total were the following monthly expenditures: $650.00 rent; $144.00 Cable/Cellphone/Internet; $450.00 Medical/Dental; $450.00 Transportation, exclusive of car payment; $200.00 Furniture Rental; $373.00 student loans; and $90.00 Cigarettes.

In seeking to have her student loans discharged, the substance of the Debtor's position centers on her affliction with the following medical ailments: (1) Postural Orthostatic Tachycardia Syndrome, known as POTS; (2) Delta Granule Storage Pool Deficiency, (3) Polycystic Ovarian Syndrome, (4) Bipolar Disorder; (5) Fibromyalgia; and (6) various neurological problems. Her children also suffer from POTS as well as Delta Granule Storage Pool Deficiency. As a result of these medical conditions, the Debtor put forth that, despite having health insurance, she incurs approximately $450.00 in monthly medical expenses.

## LAW

11 U.S.C. § 523. Exceptions to Discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

## DISCUSSION

As brought in her complaint, before this Court is the issue of whether, in contrast to the general rule, the Debtor is entitled to receive a discharge of her student-loan obligations. Pursuant to 28 U.S.C. § 157(b)(2)(I), this matter is deemed a core proceeding over which this Court has the jurisdictional authority to enter final orders. 28 U.S.C. § 1334.

■ Beginning in 1976, the Congress of the United States, based upon various policy concerns—e.g., perceived abuses, concerns for the insolvency of the student-loan program—determined that those loans incurred by a debtor to finance a higher education should be excluded from the scope of a general bankruptcy discharge. In enacting this exception to discharge, however, Congress recognized that some student-loan debtors were still deserving of the fresh-start policy provided for by the Bankruptcy Code. As a result, Congress provided that a debtor could still be discharged from their educational loans if it were established that excepting the obligations from discharge would impose an "undue hardship" upon the debtor and the debtor's dependents. *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 196 (Bankr.N.D.Ohio 2000).

■ In determining whether a debtor has met the "undue hardship" standard of § 523(a)(8), the Sixth Circuit Court of Appeals has applied,[1] although not actually limited itself to the following three considerations set forth in the seminal cases on the matter, *Brunner v. New York State Higher Educ. Serv. Corp.*:

(1) The debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependants if forced to repay the loans;

(2) Additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period; and

(3) The debtor has made a good faith effort to repay the loans. 831 F.2d 395 (2nd Cir.1987).

For these elements, the evidentiary burden is placed upon the debtor to establish the existence of each by at least a preponderance of the evidence. *Stupka v. Great Lakes Educ. (In re Stupka)*, 302 B.R. 236, 242 (Bankr.N.D.Ohio 2003).

■ Turning now to address the first prong of the Brunner Test, the minimal standard of living requirement, as it is known, centers on the policy that a debtor, after providing for his or her basic needs, may not allocate any of his or her financial resources to the detriment of their student-loan creditor(s). *See Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir.1996). Necessarily then, a court's analysis for this requirement will focus on two considerations: (1) a debtor's income; and (2) those expenses which are necessary for the debtor to meet his or her basic needs. *Flores v. U.S. Dep't of Educ. (In re Flores)*, 282 B.R. 847, 854 (Bankr. N.D.Ohio 2002). In looking at income, a debtor is expected to use their best efforts to maximize their income within their vocational profile. *Flores v. U.S. Dep't of Educ. (In re Flores)*, 282 B.R. 847, 854 (Bankr.N.D.Ohio 2002). With respect to expenses, each case is necessarily fact specific, subject to these parameters: a debt-

---

**1.** *Miller v. Pennsylvania Higher Educ. Asst. Agency (In re Miller)*, 377 F.3d 616 (6th Cir. 2004); *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356 (6th Cir.1994); *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir.1998).

or need not live in abject poverty, but a debtor is expected to do some belt-tightening and forego amenities to which he or she may have become accustomed. *Mitcham v. United States Dep't of Educ. (In re Mitcham)*, 293 B.R. 138, 144–45 (Bankr. N.D.Ohio 2003).

As applied here, the Debtor put forth a net monthly income, inclusive of child support, of approximately $3,000.00 per month. Set against this, the Debtor itemized that her minimal monthly expenses are at least $3,330.00, thereby leaving her a monthly shortfall of over $300.00. The Court, however, as just discussed above, does not have to accept at face value a debtor's enumerated income and expenses. And should in appropriate circumstances adjust a debtor's income and expenses so as to ensure that such income and expenses reflect a true picture of the debtor's financial situation. *Mitcham v. U.S. Dep't of Ed. (In re Mitcham)*, 293 B.R. 138, 144–45 (Bankr.N.D.Ohio 2003).

In looking at the specifics of this case, the Court will not question the Debtor's choice of careers; thus, removing from the table the issue as to whether she used her best efforts to maximize her income. The same, however, is not true with respect to her enumerated expenses. First, the Court agrees with the Defendant's assessment of events that some of the Debtor's expenses—such as $90.00 for cigarettes and $450.00 for transportation expense exclusive of an auto payment—are either overstated or unnecessary. Second, and even more problematic for the Court is the overall veracity which can be attached to those expense figures put forth by the Debtor.

The Debtor, according to her schedules, has no significant assets, and at the Trial did not adequately account for any potential extraneous source of income. Yet, the Debtor put forth, in her schedule J submit-ted into evidence, that her *current* expenditures exceeded her income. This is obviously an impossibility. Consequently, for purposes of allocating evidentiary weight, it is difficult to properly gauge with any accuracy the true state of the Debtor's financial affairs, an evidentiary weakness for the Debtor as she, and not the Defendant, carries the burden of proof.

On the other hand, it is also realized that no matter what modifications are made to the Debtor's expense figures, the Debtor's budget is still reliant on her receiving regular child support payments. This clearly has the potential to put the Debtor in a quandary as such payments may not always be forthcoming; in particular, it cannot be ignored that the father of one of the Debtor's children is approximately $13,000.00 in arrears on his obligation. As such, the Court finds it credible, although still to some degree speculative, that the Debtor may not be able to rely on a continuous and uninterrupted stream of child-support payments. Nevertheless, even assuming that this observation is sufficient to overcome those other considerations which bear negatively on the Debtor's position—which is far from certain considering, for example, that her 17 year son will soon become emancipated—the point becomes moot because, as the following will explain, the Debtor has not sustained her burden on either the second or third prong of the Brunner Test.

The second prong of the Brunner test requires a showing that there exist additional circumstances which show that the debtor's financially distressed state of affairs will persist for a significant part of the repayment period. *Mitchell v. U.S. Dept. Education (In re Mitchell)*, 210 B.R. 105, 108 (Bankr.N.D.Ohio 1996). This element implements the underlying purpose of the "undue hardship" standard of

§ 523(a)(8): to ensure that the financial hardship the debtor is experiencing is actually "undue," as opposed to the garden-variety financial hardship which, by definition, all debtors who seek bankruptcy relief experience. *See* 11 U.S.C. § 707(b) (requiring dismissal of case for abuse). In arguing for her compliance with this element, the Debtor relied on those medical conditions she and her children suffer. In doing so, it was put forth that her children's medical needs require both time and out-of-pocket expenses. But more importantly, the Debtor espoused that her medical conditions mean that her ability to work in the future is not assured, referring this Court to the fact that on account of her medical conditions she is often absent from work, thereby placing her job in jeopardy.

■ A debilitating medical condition, regardless of whether it is physical or mental in origin, commonly forms the basis of an "undue hardship" analysis. *Chime v. Suntech Student Loan (In re Chime)*, 296 B.R. 439, 445 (Bankr.N.D.Ohio 2003). All the same, the mere existence of a medical condition, no matter the severity, is insufficient to form the basis of "undue hardship" discharge. Instead, a strong nexus between the medical condition and its adverse effect on the debtor's terms of employment (specifically, a debtor's income) must be shown. *Swinney v. Academic Financial Servs. (In re Swinney)*, 266 B.R. 800, 805 (Bankr.N.D.Ohio 2001).

■ To establish a nexus, mere speculation will not suffice; for everyone, there exists a possibility that a medical condition will arise that will adversely affect a person's terms of employment. Rather, a debtor must come forth with evidence showing that they presently have a medical condition sufficiently debilitating to affect their ability to maintain employment, and that such a condition is unlikely to improve. *See e.g., Green v. Sallie Mae Servicing Corp (In re Green)*, 238 B.R. 727, 737 (Bankr.N.D.Ohio 1999) (debtor diagnosed with bipolar disorder entitled to hardship discharge of student loan debt). As an evidentiary matter, however, before a medical condition may form the basis of an "undue hardship" analysis, some corroborating evidence must be introduced to substantiate the debtor's position; an averment as to his or her medical condition by a debtor, standing alone, is insufficient. As was previously explained and set forth by this Court in *Siegel v. U.S.A. Group Guarantee Servs. (In re Siegel):*

> . . . in line with the Congressional policy of making student loans more difficult to discharge, substantial credible evidence must be given which supports the existence of the mental illness. Although such evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position. For example, if properly authenticated, letters from a treating physician could be utilized.

282 B.R. 629, 636 (Bankr.N.D.Ohio 2002).

■ As corroborating evidence, the Court presently has before it a hard to read exhibit entitled "Physician Statement Regarding Employee's Ability to Work" which is over two years old. (Ex. No. 1). In this document, which appears to be signed by a nurse practitioner, the Debtor's medical condition of POTS is noted, together with certain general physical limitations. Beyond this, however, the document does not provide any indication as to the existence of her other medical problems, the severity of her medical conditions or any diagnosis relating to an

opinion as to whether the Debtor's future ability to work is threatened. To the contrary, the document notes that the Debtor is "able to perform the essential functions of employees position." As such, this document, standing alone, is insufficient to corroborate the Debtor's testimony regarding her future ability to work.

Consequently, without any substantive evidence to corroborate the Debtor's testimony regarding her medical conditions, the Court must find that the Debtor has failed to sustain her burden under the second prong of the Brunner Test. In this regard, the Court posits this question: Without more, would this document, along with the Debtor's self-serving testimony, have been sufficient to establish the right to government benefits such as S.S.D. or Workman's Compensation? If not, what policy reasons compel that bankruptcy law accept a significantly lower evidentiary threshold?

■ The third and final prong of the Brunner Test looks to whether the "debtor has made a good faith effort to repay the loans." As would be expected, of primary importance in any analysis under this standard is whether and then the extent to which the Debtor has made any payments on their student-loan obligations. *See, e.g., England v. United States of America (In re England)*, 264 B.R. 38, 50 (Bankr.D.Idaho 2001) ("a debtor's efforts to deal with unpaid students loans is critical to showing good faith."). In this case, the Defendant acknowledged that it has received some payments, although sporadic, from the Debtor. The Defendant, however, takes the position that such payments were not voluntary, and thus should not be factored into any good faith analysis.

In line with the Defendant's position, this Court has made a distinction between voluntary and involuntary payments, with the latter not bearing favorably on a good faith analysis. *Bruen v. United States (In re Bruen)*, 276 B.R. 837, 842 (Bankr. N.D.Ohio 2001); *Boyd v. U.S. Dep't of Educ. (In re Boyd)*, 254 B.R. at 404 (Bankr.N.D.Ohio 2000). Typically, in the student-loan situation, an involuntary payment will arise as the result of a creditor intercepting a debtor's tax refund, or, as occurs in other situations, by the creditor garnishing the debtor's wages. The circumstances here, however, are slightly different. The Debtor, while also having had her wages garnished, did make some minor payments on her student-loan debt, but only after being threatened with collection action. The question, therefore, naturally arises, are payments made due to the threat of legal action, but not actually the result of legal action, voluntary for purposes of Brunner's good faith requirement?

■ Black's Law Dictionary defines a voluntary act as one, "[u]nconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself." BLACK's LAW DICTIONARY 1575 (6th ed.1990). Webster's dictionary similarly defines voluntary as "[a]rising from one's own free will; Acting on one's own initiative." WEBSTER's II 1294 (1984). Facially then, a voluntary payment envisions a payment made by a debtor completely on their own accord; not, as is the situation here, under the direct threat of legal action which is highly indicative of a person who had attempted to avoid repaying the debt. As a point of contrast, a debtor who simply does not have the means to pay the debt, as the Debtor here contends, could not have been coerced into making a payment through the threat of legal action. The incongruity of the Debtor's payment history as against the good faith requirement becomes even more stark when viewed in light of the purpose underlying the requirement: to ensure that a debtor has acted responsibly

toward the creditor given that credit was extended without regards to the debtor's creditworthiness. *Stupka v. Great Lakes Educ. (In re Stupka)*, 302 B.R. 236, 244 (Bankr.N.D.Ohio 2003).

Still, "good faith," is an amorphous concept, being largely defined by factual inquiry. *Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 738 (6th Cir.1994) (interpreting "good faith" as a basis to establish "cause" to lift the stay). As such, payment (or the lack thereof) is not always dispositive of the issue, with other considerations possibly coming into the mix. Here, mitigating in favor of a finding of good faith is the fact that the Debtor has made an effort to maximize her earning potential, even at times holding a second job. Also, in obtaining deferments, the Debtor did not seek an immediate discharge of her educational obligations. *Mitcham v. United States Dep't of Educ. (In re Mitcham)*, 293 B.R. 138, 148 (Bankr.N.D.Ohio 2003) (listing these factors, among others, for a court to consider in assessing good faith.). Notwithstanding, these considerations are completely offset by two prominent features of this case: (1) the Debtor did not first attempt to participate in the Income Contingent Repayment Program which bases repayment on income; and (2) the Debtor's current employment is directly traceable to her education, thus showing that the Debtor obtained a tangible benefit from her educational loans. *Id.; Stupka v. Great Lakes Educ. (In re Stupka)*, 302 B.R. 236, 244 (Bankr.N.D.Ohio 2003) (discussing the income contingent repayment program).

In the final analysis then, since the Debtor failed to make any voluntary payments on her loan obligations, and based upon the countervailing considerations that must be weighed against those factors pertaining favorably to her good faith, it is the finding of this Court that the Debtor has failed to sustain her burden under the third prong of the Brunner Test. Consequently, for this reason, together with her failure to sustain her burden under the second prong of the Brunner Test, the Debtor is not entitled to an "undue hardship" discharge of her student-loan debts.

In the absence of a finding of "undue hardship," however, it has been the established practice of this Court to consider whether a debtor may still be entitled to some relief from their student-loan obligations, such as by a partial discharge of the debt. Although limited to the situation where, despite not meeting the standard of § 523(a)(8), the factual circumstances called for an equitable adjustment of the debtor's student-loan obligations, the Court granted such relief on the premise that besides the obvious benefit to the debtor, the creditor could also benefit—by having an educational debt liquidated at an achievable threshold, the debtor had an incentive to pay the debt, thereby preventing the debtor from simply ignoring the debt altogether. As authority for this position, this Court relied on § 105(a), not § 523(a)(8), which provides, in relevant part, that a bankruptcy "court may issue any order, process, or judgment that is necessary to carry out the provisions of this title."

In *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, the Sixth Circuit Court of Appeals approved of this practice, stating:

> Although the bankruptcy court should not have discharged the ... entire student loans, we believe it had the power to take action short of total discharge. We find this authority in 11 U.S.C. § 105(a), which permits the bankruptcy court to issue 'any order, process, or judgment that is necessary or appropri-

ate to carry out the provisions of this title,' so long as such act is consistent with the Bankruptcy Act. In a student-loan discharge case where undue hardship does not exist, but where facts and circumstances require intervention in the financial burden in the debtor, an all-or-nothing treatment thwarts the purpose of the Bankruptcy Act.

144 F.3d 433, 438–439 (6th Cir.1998) (internal citations omitted). The Sixth Circuit then went on to state:

> We conclude that, pursuant to its powers codified in § 105(a), the bankruptcy court here may fashion a remedy allowing the Hornsbys ultimately to satisfy their obligations to TSAC while at the same time providing them some of the benefits that bankruptcy brings in the form of relief from oppressive financial circumstances.

*Id.* at 440. The propriety of utilizing § 105(a) as an independent source for the dischargeability of educational loans was later reinforced by the Sixth Circuit in an unpublished opinion, wherein it was stated, "based upon this court's prior binding decision in Hornsby, we reject the overlay theory of the BAP in favor of the independent § 105 equitable grounds theory relied upon by the bankruptcy court." *DeMatteis v. Case W. Reserve Univ. (In re De-Matteis),* No. 02–3003, 97 Fed.Appx. 6, 9, 2004 WL 445167, at *3 (6th Cir.Mar.8, 2004).

Recently, however, the Sixth Circuit again took up the matter as to the partial discharge of student loans in bankruptcy, framing the issue to be addressed as this:

> The central issues of this appeal are ... whether a bankruptcy court can rely on § 105(a) to grant a partial discharge of student loan indebtedness and whether, before a bankruptcy court grants such a discharge, it must first find that the portion being discharged satisfies the

'undue hardship' requirement of 11 U.S.C. § 523(a)(8).

*Miller v. Pennsylvania Higher Educ. Asst. Agency (In re Miller),* 377 F.3d 616, 619 (6th Cir.2004). After discussing, in detail, its prior decision in *In re Hornsby,* the Sixth Circuit in *In re Miller* rejected the creditor's contention that partial discharges in bankruptcy were not allowed, stating that the "assertion that a bankruptcy court must rely exclusively on § 523(a)(8) to grant any discharge of student loans in bankruptcy must fail." *Id.* at 620. However, in looking at the *In re Hornsby* decision, in conjuncture with the powers of a bankruptcy court to issue orders under § 105(a), it noted that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code" and that "relying on § 105(a) independently provides no rubric with which bankruptcy courts are able to evaluate whether to grant a partial discharge of student loan indebtedness to a debtor in bankruptcy." *Id.* at 621–22, *citing Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

As a result, the Sixth Circuit concluded that it "cannot be true that Hornsby endorsed the idea that, while § 523(a)(8) sets the condition for a discharge of student loan indebtedness, a bankruptcy court could rely on § 105(a) to evade the plain language of that provision by granting a partial discharge for reasons other than undue hardship." *In re Miller,* 377 F.3d at 621 (internal quotation omitted). Accordingly, the Miller Court explicitly rejected its prior holding in the unpublished decision of *In re DeMatteis,* stating: "Section 523(a)(8) permits the discharge of student loans only upon a finding that denying such discharge would impose undue hardship on the debtor. Relying on

§ 105 to discharge student loan indebtedness for reasons other than undue hardship impermissibly contravenes the express language of the bankruptcy code." *Id.* at 624 (internal citation omitted). Simply put, "the requirement of undue hardship must always apply to the discharge of student loans in bankruptcy—regardless of whether a court is discharging a debtor's student loans in full or only partially." *Id.* at 622.

■ Although not directly stated in *In re Miller*, the result of requiring the existence of "undue hardship" in a partial discharge analysis is to preclude providing such relief, as has been this Court's prior practice, when it was beneficial or otherwise equitable from the perspective of the debtor. The following example given in the *In re Miller* case helps to illustrates why:

> assume that a debtor owes $100,000 in student loans, and repayment of the full amount would impose undue hardship on the debtor but repayment of $40,000 would not. Hornsby indicates that a bankruptcy court would discharge $60,000 of the debt, the amount for which repayment would impose an undue hardship.

*Id.* at 621. Obviously, in this situation, the debtor would like to receive a full discharge of the student-loan obligation. And such relief could be provided, the bankruptcy court having found that the repayment of the $100,000.00 did, in fact, constitute an "undue hardship." Consequently, if the court were to require the debtor to repay $40,000.00 of the debt, as this example shows, the benefit of the partial discharge inures not to the debtor, who would like to see the whole debt discharged, but instead solely to the benefit of the creditor. A slight change in the above facts, however, also shows why it is now not possible for a court to partially discharge a student-loan obligation when it confers a benefit directly upon the debtor.

Assume that, because a debtor did not establish their burden under just the second prong of the Brunner Test, an "undue hardship" is not found to exist for purposes of repaying the $100,000.00 student loan. Assume also, that the equities of the case pertain favorably to a partial discharge of the debt under the standard previously outlined by this Court [2]—e.g., the debtor acted in good faith and does not have the present ability to pay the debt. In such a situation, the debtor, of course, would implore this Court to grant a partial discharge of the educational debt, say to $40,000.00 as in the above example. And utilizing § 105(a) as an independent source of relief, as previously approved by the

**2.** Cases by this Court either finding or addressing the issue of a partial discharge under § 105(a): *Stupka v. Great Lakes Educ. (In re Stupka),* 302 B.R. 236 (Bankr.N.D.Ohio 2003); *Hall v. U.S. Dep't. of Educ. (In re Hall),* 293 B.R. 731 (Bankr.N.D.Ohio 2002); *Siegel v. U.S.A. Group Guarantee Servs. (In re Siegel),* 282 B.R. 629 (Bankr.N.D.Ohio 2002); *Flores v. United States Dep't of Educ. (In re Flores),* 282 B.R. 847, 853 (Bankr.N.D.Ohio 2002); *Kirchhofer v. Direct Loans (In re Kirchhofer),* 278 B.R. 162 (Bankr.N.D.Ohio 2002); *Bruen v. United States (In re Bruen),* 276 B.R. 837 (Bankr.N.D.Ohio 2001); *Swinney v. Academic Financial Servs. (In re Swinney),* 266 B.R. 800 (Bankr.N.D.Ohio 2001); *Robbins v.* *U.S. Dep't of Educ. (In re Robbins),* 265 B.R. 763 (Bankr.N.D.Ohio 2001); *Wilcox v. Educ. Credit Management (In re Wilcox),* 265 B.R. 864 (Bankr.N.D.Ohio 2001); *Berry v. Educ. Credit Mgmt. Corp. (In re Berry),* 266 B.R. 359 (Bankr.N.D.Ohio 2000); *Miller v. U.S. Dep't of Educ. (In re Miller),* 254 B.R. 200 (Bankr. N.D.Ohio 2000); *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine),* 254 B.R. 191 (Bankr.N.D.Ohio 2000); *Boyd v. U.S. Dep't of Educ. (In re Boyd),* 254 B.R. 399 (Bankr. N.D.Ohio 2000); *Fraley v. United States Dept. of Educ. (In re Fraley),* 247 B.R. 417 (Bankr. N.D.Ohio 2000); *Gammoh v. Ohio Student Loan Comm'n (In re Gammoh),* 174 B.R. 707 (Bankr.N.D.Ohio 1994).

Sixth Circuit in *In re DeMatteis,* would make such relief possible.

The *In re Miller* decision, however, makes it clear that a partial discharge can only be granted upon a finding of an "undue hardship" as set forth § 523(a)(8); in the above example, this would mean, in order to lower the debt to $40,000.00, a finding as to the existence of an "undue hardship" in repaying the $60,000.00 would have to be made. However, to provide such an equitable adjustment of the debtor's student-loan obligations would then have to necessarily follow this logical progression: No "undue hardship" exists for the debtor to repay a $100,000.00 student-loan obligation, but an "undue hardship" does exist for the debtor to repay $60,000.00 of the educational debt. In other words, the decision of the bankruptcy court would be holding that, (1) on the one hand, a debtor can pay a $100,000.00 student-loan debt, but (2) on the other hand, the decision would also hold that the debtor cannot pay $60,000.00 of that debt and therefore, the debtor's student-loan should be reduced to $40,000.00. This is simply a *non sequitur;* as, when boiled down to its simplest terms, how can a person be found to be able to afford to pay a $100,000.00 debt, but not a $60,000.00 debt.

Therefore, both in the instant matter and in any ensuing cases, this Court, based upon the Sixth Circuit's decision in *In re Miller,* will not invoke its equitable powers under § 105(a) so as to effectuate a partial discharge of a student-loan obligation when, as here, the benefit of the relief is directed toward the debtor. Thus, while the equities in this matter seemingly call for an equitable adjustment of her student-loan obligations, the Court cannot provide such relief as the Debtor has failed to sustain her burden under the Brunner "undue hardship" test. In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that those educational obligations held by the Defendant, ECMC, against the Plaintiff/Debtor, Branwen Lowe, be, and are hereby, determined to be NONDISCHARGEABLE DEBTS.

It is **FURTHER ORDERED** that this case, be, and is hereby, DISMISSED.